**In re Roland Earl PEACOCK and wife, Linda Sue French Peacock, Debtors.**

**Bankruptcy No. 480–00223.**

United States Bankruptcy Court,
N. D. Texas,
Fort Worth Division.

Nov. 14, 1980.

St. Clair Newbern, III, Fort Worth, Tex., for debtors, Peacocks.

Rufus Garrett, Jr., Fort Worth, Tex., for Borg–Warner Leasing, Inc.

Tim Truman, Fort Worth, Tex., Interim Trustee.

## MEMORANDUM OPINION

JOHN FLOWERS, Bankruptcy Judge.

The issue in this case arises from a novel application of the "cram down" provisions of Chapter 13 to lease agreements which the debtor asserts are intended as security devices. Chapter 13 authorizes the Court to confirm a plan in which the present value of any deferred payments to a secured creditor equals the value of the collateral, 11 U.S.C. §§ 1325(a)(5), 506(a). The issue here is whether claims arising under the debtor's lease agreements may be treated as secured claims for purposes of the § 1325(a)(5) "cram down".

## FINDINGS OF FACT

The business relationship between the debtors and Borg–Warner Leasing, Inc. began in August, 1979, when the debtor and representatives of Borg–Warner traveled to Ohio for the purpose of purchasing dairy cows which Borg–Warner then leased to the debtors. The parties entered into three agreements under which the debtors received 68 Holstein cows and various items of farm equipment.

The agreement labeled Equipment Lease reflects that Borg–Warner paid $20,884.50 for certain farm equipment. It then delivered the equipment to the debtor under a lease that obligated the debtors to pay a total of $33,672.00 over a 60 month term. In the event of default, the lessor is entitled to repossess the equipment, and may recover from the lessee a sum equal to the total unpaid rental which would have accrued for the balance of the rental term less only the net proceeds of any reletting or sale. No option to purchase is granted the lessee in the equipment lease.

The parties also executed two documents entitled Cow Lease Agreement. These documents contain in essence identical terms, one pertains to a transfer of 35 cows in August, 1979, and the other to a transfer of 33 cows in November, 1979. Borg–Warner paid the third party Ohio seller $124,495.00 for the 68 cows which it then transferred to the debtors pursuant to the leases. In turn under the cow leases the debtors became unconditionally obligated to pay $223,848.00 over the 60 month term.

Unlike the equipment lease, the cow leases grant the lessee an option to purchase the cows at the end of the lease term at a combined option price of $24,899 which amounts to approximately $366 per cow. In the event of default, the lessee is obligated to deliver the cows to the lessor and is liable for the option price of any cow not delivered. If the lessor then sells the repossessed cows, and a deficiency results, the lessee is liable for such deficiency.

Under all the leases involved, the lessee is obligated to obtain insurance and bears the entire risk of loss to the property. Financing statements regarding all three leases were properly filed in the public records.

The debtors filed their joint petition for relief under Chapter 13 of the Bankruptcy Code on May 16, 1980. On July 9, 1980 the debtors filed their Chapter 13 plan which provided that "Debtor elects to treat Borg–Warner as a secured creditor and will pay to Borg–Warner the fair market value of the 60 dairy cows ($60,000) and the dairy equipment ($18,000) as of the date of this

plan, in sixty monthly installments of $1820 each . . ." The debtors have not asserted a claim of usury. Borg–Warner filed an application under § 365 of the Bankruptcy Code requesting the Court to order the debtor to accept or reject the leases according to the terms originally agreed upon.

At trial, the debtor testified that but for the option to purchase he would not have signed the cow lease agreements. The Debtors and Borg–Warner introduced conflicting testimony regarding the value of the cows. I find that the fair market value of the cows to be $875.00 per cow, as of the date the purchase option could be exercised by the debtor.

## CONCLUSIONS OF LAW

The issue squarely presented is whether any or all of the leases are actually intended as security devices. An examination of the case law reveals a lack of uniformity in the methods used to analyze leases alleged to be security devices. The problem of determining an appropriate legal standard for the issue is further complicated by the almost infinite variety of leases found in contemporary leasing arrangements which are being utilized in an ever growing number of consumer and commercial transactions.

The Bankruptcy Code does not define "lease". It does define "security interest" to be a lien created by agreement, 11 U.S.C. § 101(37). The legislative history states, "Whether a consignment or a lease constitutes a security interest under the bankruptcy code will depend on whether it constitutes a security interest under applicable state or local law." House Report No. 95–595, 95th Cong. 1st Sess. (1977) 313–314, U.S.Code Cong. & Admin.News 1978, p. 5787.

The principal state law authority on this question is the definition of a "security interest" found in the Uniform Commercial Code [Texas Business & Commercial Code § 1.201(37)] which provides in pertinent part:

"Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation. Unless a lease or consignment is intended as security, reservation of title thereunder is not a "security interest . . ." Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

Professor Gilmore has pointed out that the word "intended" as used in the § 1.201(37) definition has nothing to do with the subjective intention of the parties. GILMORE, SECURITY INTERESTS IN PERSONAL PROPERTY § 11.2, at 338. The question then becomes by what objective criteria are lease agreements to be adjudged security devices. An examination of the authorities reveals that the following three–tier analysis is an appropriate, though not exclusive, procedure to review lease agreements which are alleged to be security devices.

The first tier of analysis is mandated by the opening sentence of § 1.201(37): "Security interest means an interest in personal property or fixtures which secures payment or performance of an obligation." In order to find that a lease is intended as security, it is necessary to find an obligation on the part of the lessee that is to be secured. A definite obligation to pay rentals during the lease term totaling an amount substantially equivalent, to the fair market value of the leased property plus a financing factor as viewed at the time the property is transferred to the lessee, is a precondition to finding that the lease is intended as security. Conversely an agreement that gives the lessee the right to terminate the lease at any time during the lease term, without any obligation for rents accruing during the remainder of the lease term, should undoubtedly be viewed as a true lease.

Upon finding a sufficient obligation on the part of the lessee, it is necessary to proceed to a second tier of analysis. If the agreement provides that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration, the court is compelled as a matter of law to find that the lease is intended as security, § 1.207(37), *In re Vaillancourt*, 7 U.C.C.Rep. 748, 759 (U.S.Dist.Ct., D.Maine, 1970). *Tackett v. Mid–Continent Refrigeration Co.*, 579 S.W.2d 545 (Tex.Civ.App.–Ft. Worth, 1979, writ ref'd n. r. e.).

The Uniform Commercial Code does not define "nominal". Common usage of the word as indicated in Webster's Third New International Dictionary (1976), defines nominal as one "being so small, slight, or negligible as scarcely to be entitled to the name". *In re Vaillancourt*, supra, is a decision involving a negligible consideration; the lessee was given an option to purchase at the end of the lease term for a consideration of $1.00. In *Tackett*, supra, no additional consideration was required at the end of the term for the lessee to become owner.

■ Other cases have found substantial dollar amounts to be nominal consideration after comparing the option price to the fair market value of the leased property at the termination of the lease; $1,350 option price described as "nominal" in *In re Washington Processing Co., Inc.*, 3 U.C.C.Rep. 475 (U.S.Dist.Ct.S.D.Cal., 1966); $1,000 option price described a "nominal" in *Peco, Inc. v. Hartbauer Tool and Die Co.*, 262 Or. 573, 500 P.2d 708 (1972). By characterizing significant dollar amounts as nominal, those courts have implicitly adopted a relative rather than absolute definition of nominal. Invariably the large dollar "nominal price" cases also cite other factors in finding that the lease is intended as a security device. In view of the mandate of § 1.201(37) which compels a court to hold a nominal option price lease is intended as security regardless of other lease terms, the adopted approach is to construe "nominal consideration" in a narrow and absolute fashion to mean a few dollars.

■ A finding that the lease agreement contains an option to purchase for a consideration that is more than nominal or that the agreement contains no option requires the court to proceed to a third tier of analysis to determine by the facts of each case whether the lease is intended as security, *Davis Brothers v. Misco Leasing, Inc.*, 508 S.W.2d 908 (Tex.Civ.App.–Amarillo, 1974, no writ); see also *Peco, Inc.* supra. In other words a finding of more than nominal consideration does not compel a conclusion that a true lease is intended.

■ The third tier of analysis is an inquiry into whether the lessor has effectively bargained away the absolute right to retake control and use the leased property. That absolute right to retake control and use the leased property is a significant characteristic of a true lease, *Transamerica Leasing Corp. v. Bureau of Revenue*, 80 N.M. 48, 450 P.2d 934 (1969); see also *Gershwin v. U. S.*, 153 F.Supp. 477 (U.S.Ct.Cl.1957).

A review of the authorities reveals at least three types of agreements in which the lessor has effectively bargained away the right of absolute control.

(a) OBLIGATION TO DISPOSE

The lease provides that at the termination of the lease, the lessor is obligated to dispose of the property, and the lessee is entitled to any profit and bears any loss resulting from such disposition, *Matter of Tillery*, 571 F.2d 1361 (5th Cir., 1978); *In re Tulsa Post Warehouse Co., Inc.*, 4 B.R. 801, (U.S.Dist.Ct.N.D.Okla.1980). In these decisions the Court found that the lessee had an equity in the property and that the lessee had the real interest in the final disposition of the property.

(b) REASONABLY ANTICIPATED OPTION

The lease agreement grants the lessee an option to purchase which the parties at the inception of the lease could have reasonably anticipated that the lessee would exercise. Several courts have contemplated the significance of an option to purchase at a price that is more than nominal, *Davis Brothers,*

supra; *All–States Leasing Co. v. Ochs,* 27 U.C.C.Rep. 808, 42 Or.App. 319, 600 P.2d 899 (Or.App.1979); *In re Joe Necessary and Son, Inc.,* 27 U.C.C.Rep. 551, 475 F.Supp. 610 (U.S.Dist.Ct.W.D.Va., 1979).

As indicated in the discussion of the second tier analysis, some cases deal with the problem of a high dollar purchase option by characterizing an option price to be nominal when the option price is smaller than the fair market value of the leased property. An example of such price balancing is reflected by the evolution of the "only sensible alternative" test. Under this test options have been deemed nominal and consequently leases treated as security when the lessee has no sensible alternative except to exercise the option, *Davis Brothers,* supra; *All–States,* supra. The "only sensible alternative" test unfortunately may result in substantial dollar sums being described as nominal, including some amounts which unduly extend the common meaning of a nominal amount.

The above cited cases recognize that in certain instances a lease agreement containing an option price of a substantial dollar amount may be intended as a security device. The Uniform Commercial Code § 1.201(37) is silent as to the significance of a more than nominal option price. The Code of course states that the inclusion of an option to purchase does not of itself make the lease one intended for security. However a finding that the parties could reasonably anticipate the lessee would exercise the option, when coupled with an obligation to pay the capitalized cost of the leased property, is persuasive evidence that the lease is intended as security. Some pre–Code law, including the Uniform Conditional Sales Act, (U.S.C.A.) declared leases to be intended as security where (1) the lessee–debtor is obligated to pay an amount substantially equal to the purchase price; and (2) the lessee–debtor thereby acquires, or has the option to acquire the status of "owner" of the item conditionally sold. See Coogan, *Leases of Equipment and Some Other Unconventional Security Devices: An Analysis of U.C.C. § 1–201(37) and Art. 9,* 1973 Duke L.J. 909 (1973). The "reasonably anticipated" option test is a narrower analysis than that of the U.S.C.A. The lease will be deemed a security device only in those cases where the lessor could reasonably anticipate that his absolute right to retake control would be divested by the lessee's exercise of the option.

A "reasonably anticipated" option is indicated where the option price is less than the fair market value. Such an option may also be found where the evidence establishes that the lessee would not have entered into the lease but for the purchase option, or where the lessee expresses an intent to exercise the option in unequivocal language or conduct.

### (c) THE USEFUL LIFE LEASE

The lessee is entitled to possess the leased property for a primary term and applicable renewal terms substantially corresponding to the estimated useful life of the property. *Leasing Service Corp. v. American National Bank & Trust Co.,* 19 U.C.C.Rep. 252 (U.S. Dist.Ct., D.N.J.1976); *O. P. M. Leasing Services, Inc. v. Homestead Fabrics, Inc.,* 18 U.C.C.Rep. 1342 (N.Y.S.Ct., 1976); *In re Pomona Valley Inn,* 4 U.C.C.Rep. 893 (U.S. Dist.Ct.C.D.Calif., 1967); *In re Transcontinental Industries, Inc.,* 3 U.C.C.Rep. 235 (U.S.Dist.Ct.N.D.Ga.1965). By definition, where the lessee retains the property for its entire useful life the lessor can have no significant residual proprietary rights in the property. In effect the lessor has bargained away the absolute right to retake control and use the property.

In summary the first tier obligation requirement is a precondition to all findings that a lease is intended as security. The second tier nominal option test in an appropriate case compels a finding that the lease is intended as security. The third tier of inquiry into whether the lessor bargained away the absolute right to retake control may provide persuasive evidence that the lease functions as a security device. Other factors may be relevant to the ultimate determination, such as a duty on the lessee to insure, risk of loss and liability for taxes on lessee, and lessor's status as a "financing lessor", however such factors are less per-

suasive as they are essentially matters of contract negotiation.

Borg–Warner cites a line of cases suggesting that an obligation on the lessee to purchase the leased property is a necessary prerequisite to finding that the purported lease is intended as a security device; *Security Life Insurance Co. v. Executive Car Leasing Co.*, 433 S.W.2d 915 (Tex.Civ.App.–Texarkana, 1968, writ ref. n. r. e.); *Southwest Park Outpatient Surgery, Ltd. v. Chandler Leasing Divisions*, 572 S.W.2d 53 (Tex.Civ.App.–Houston, [1st. Dist.] 1978); *Brokers Leasing Corp. v. Standard Pipeline*, 602 S.W.2d 278 (Tex.Civ.App.–Dallas, 1980).

In the line of cases cited by Borg–Warner, the question presented is whether the purported lease is actually a sales agreement which is subject to the usury law. The Broker's Leasing opinion recognizes that the *Davis Brothers* decision noted supra, and *Tom Benson Chevway Rental & Leasing v. Allen*, 571 S.W.2d 346, (Tex.Civ.App.–El Paso, 1978, writ ref'd n. r. e.), cert. denied, 442 U.S. 930, 99 S.Ct. 2861, 61 L.Ed.2d 298 (1979), were concerned with whether a purported lease was intended as security. However the Court concludes, "These two cases are not controlling here because they do not concern the question of whether a contract which purports to be a lease is actually a conditional sale subject to the usury laws", *Brokers Leasing* at 280.

The opinion in *Brokers Leasing* is limited to those cases in which a usury claim is asserted. Consequently I find the obligation to purchase test is not controlling in the instant case where the debtor has not asserted a usury claim. Although an express obligation on the part of the lessee to purchase the leased property may be very clear evidence that the parties intend the lease as security, to hold that it is a prerequisite to such a finding would create a narrow, inflexible rule inconsistent with the broad factual inquiry anticipated by the definition of "security interest" in the Uniform Commercial Code.

 Applying the three tier analysis to the lease agreements between the debtors and Borg–Warner the following results are reached. Regarding the equipment lease, the first tier of analysis reflects that the lessee is unconditionally obligated to pay an amount ($33,672) substantially equivalent to the initial value of the equipment ($20,-884.50) plus a financing factor. The equipment lease contains no purchase option, therefore, it does not fall within the second tier nominal option analysis. Finally the evidence does not affirmatively show that the lessor has bargained away the right to retake control and use the equipment. No evidence was presented as to whether the 60 month lease term was substantially equivalent to the useful life of the equipment. It would be improper to speculate as to its useful life, consequently I hold that the equipment lease is a true lease. It should be noted that an affirmative first tier finding is of itself insufficient evidence that the lease is intended as security. Lessor is entitled to set rentals in an amount sufficient to cover anticipated depreciation of the asset.

 Regarding the cow leases, the first tier of analysis reflects that the lessee is unconditionally obligated to pay an amount ($223,848) substantially equal to the capitalized cost ($124,495) of the cows. The cow lease contains a purchase option at a price that is 41% of the disposition value of the cows. The option price is more than nominal. I find however that the option was of a nature that the parties at the inception of the lease reasonably anticipated that the lessee would exercise it. The option price is significantly less than the fair market value of the cows. Furthermore, the debtor testified that he would not have entered into the lease agreement if no purchase option was contained in the agreement. Borg–Warner could reasonably anticipate that effectively it had bargained away the right to retake control and use the cows. In view of this persuasive evidence, and recognizing the agreement contains other terms consistent with a sales transaction, I hold that the cow leases are intended as a security device.