**In re P.W.L. INVESTMENTS, Debtor.**

**CHASE LEASING CO. LTD., Plaintiff,**

v.

**P.W.L. INVESTMENTS, Defendant.**

**Bankruptcy No. 5-86-01930-A.**

United States Bankruptcy Court,
W.D. Texas,
San Antonio Division.

April 10, 1987.

Dean W. Greer, Law Offices of Bruce Waitz, P.C., San Antonio, Tex., for debtor.

Ronald B. King, Foster, Lewis, Langley, Gardner & Banack, Inc., San Antonio, Tex., for Chase Leasing Co. Ltd.

MEMORANDUM OPINION

R. GLEN AYERS, Jr., Chief Judge.

This case comes before this Court on a Motion For Relief From Stay filed by Chase Leasing Co. Ltd. (hereafter referred to as Chase Leasing). The issue presented is whether the agreement signed by Chase Leasing and the Debtor, P.W.L. Investments, is a "true lease" or a security interest evidencing a disguised sale.

P.W.L. Investments is in the retail and wholesale liquor sales business. It decided to purchase a computerized point of sale system consisting of both hardware and software. Prior to its initial contact with Chase Leasing, P.W.L. Investments selected the hardware and software, negotiated the purchase price and negotiated the terms for the continual updating of the software. P.W.L. Investments had obtained a provisional line of credit for the purchase price of $78,705.00. In an effort not to increase its balance sheet liabilities, P.W.L. Investments contacted Chase Leasing. P.W.L. Investments knew that Chase Leasing was in the business of leasing equipment to commercial and business users. Chase Leasing is not and has never been in the business of lending money or directly financing the purchase of equipment.

On October 1, 1986 the parties entered into a written agreement entitled a Business Equipment Master Lease (the Lease). This Lease covered the computer hardware and software P.W.L. Investments had previously decided to purchase with its line of credit. This allowed P.W.L. Investments to obtain the equipment it wanted without

affecting its credit. The lease term was for five years with monthly payments of $1,899.57. The payments included the sales tax prorated over five years. The Lease contained a renewal clause of one year with monthly payments of $773.96 which could be exercised at the discretion of the Lessee. Article 3.02 of the Lease required a security deposit equal to ten percent of the purchase price of the equipment to be leased ($7,900.00) that would be fully refunded at the end of the Lease. The security deposit could also be applied to the purchase price of the leased goods, or could be used to cure any defaults. Articles 6, 7, and 9 provided that 1) all maintenance was the sole responsibility of the Lessee: 2) the risk of loss and damage was on the Lessee: 3) all taxes were the sole responsibility of the Lessee: and, 4) the Lessee must keep the equipment insured for its full value and carry liability insurance. Articles 10 and 11 established that the leased equipment was the personal property of the Lessor. The Lease transferred no right, title, or equity. Article 13 set out the purchase option. At any time after November 1, 1986 until the termination of the Lease, P.W.L. Investments could purchase the leased equipment at fair market value.

The equipment was installed, the software customized, and the employees trained, all at Chase Leasing's expense. Before making its first monthly lease payment, P.W.L. Investments filed a Chapter 11 petition in this Court. As of this date Chase Leasing has received no payments.

It is the contention of the Debtor/Lessee that the agreement signed on October 1, 1986 was merely a security agreement; that, P.W.L. Investments had purchased the equipment; and, therefore, that Chase Leasing is only entitled to adequate protection under the Bankruptcy Code. On the other hand, Chase Leasing, the Creditor/Lessor, has filed a Motion to have this Court grant a Relief from Stay, order P.W.L. Investments make postpetition lease payments in their full amount, order P.W.L. Investment accept or reject the lease, and, further, if P.W.L. Investments fails to accept or reject the lease or comply with its terms, order such relief the Court deems proper.

The Bankruptcy Code does not define a "true lease", but it does define a security interest as a lien on goods created by agreement. *See* 11 U.S.C. § 101(37) (1976 Ed.Supp. II). Congress has stated "Whether a consignment or a lease constitutes a security agreement under the Bankruptcy Code will depend on whether it constitutes a security interest under applicable state or local law." *See In re Peacock*, 6 B.R. 922, 924 (Bankr.N.D.Tex.1980); House Report No. 95–595, 95th Cong. 1st Sess. (1977) 313–14, U.S.Code Cong. & Admin.News 1978, p. 5787, 6270–6271. The applicable Texas law as to whether an agreement is a "true lease" or a security interest, is section 1.201(37) of the Texas Business and Commerce Code which states:

> "Security interest means an interest in personal property or fixtures which secures payment or performance of an obligation. Unless a lease or consignment is intended as security, reservation of title thereunder is not a 'security interest' ... Whether a lease is intended as security is to be determined by the facts of each case; however, a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security."

Tex.Bus. & Com.Code Ann. 1.201(37) (Tex. UCC) (Vernon Supp.1987).

In order to reach a decision as to whether the agreement signed by Chase Leasing and P.W.L. Investments is a "true lease" or a disguised sale in the form of a security interest this Court will apply the three tier test used by most jurisdictions including Texas. *See Sunset Enterprises, Inc. v. B & B Coal Co., Inc.*, 38 B.R. 712, 715 (W.D. Va.1984); *In re Brookside Drugstores*, 3 B.R. 120, 122 (D.Conn.1980); *In re Huffman*, 63 B.R. 737, 738 (Bank.N.D.Ga.1986); *In re Peacock*, 6 B.R. 922, 924 (Bank.N.D.

Tex.1980). For the agreement to be held a security interest each of the tests or tiers must be satisfied; simply put they are:

1. the finding of a definite obligation to pay rentals during the lease term in an amount substantially equivalent to the fair market value of the leased goods plus a financing charge;

2. an option to become the owner of the leased property at the end of the lease for no consideration or for a nominal consideration;

3. whether the lessor has effectively bargained away the absolute right to retake control of the leased goods.

See *Sunset,* 38 B.R. at 715.

In addition, section 1.201(37) requires that this court "... determine the intent of the parties in the light of the facts and circumstances of each case and that the substance of the document rather than mere formality of wording must be examined to determine whether the transaction involved is a lease or a security agreement." *Davis Brothers v. Misco Leasing, Inc.,* 508 S.W.2d 908, 912–13 (Tex.Civ.App. 1974, no writ). In essence, given all the factors surrounding the agreement and economic realities, the real issue is the ultimate intent of the parties. The court will address each of the three tiers and the agreement as a whole in deciding whether it is a "true lease" or a security agreement.

To satisfy the first tier of the analysis it must be shown that the Lessee is under an absolute obligation to make regular payments to the Lessor. It is undisputed that P.W.L. Investments agreed to make monthly payments to Chase Leasing in the amount of $1,798.41 plus sales tax. The Lease provides in Article 3 that the Lessee shall remain liable for the full amount of the Lease obligation. If the total of these payments over the life of the lease equals the original purchase price plus interest, then the courts tend to consider the agreement a security interest. In the agreement signed by the parties in the instant case, the payments during the primary term total $107,904.60 exclusive of sales tax. The difference between the Lessor's purchase price and the total payments is $29,199.60,

which this Court considers the Lessor's profit for handling the Lease (or interest) and compensation for any loss it might sustain on the transaction. The majority of leases used today provide for the lessor to recoup his costs and make a profit by charging lease payments in excess of his initial cost. If merely making a profit makes a lease a security agreement, then every lease would be a security agreement. Chase Leasing, like most business, operates to make a profit. It does so by charging more in rental payments than its purchase price. Making a profit in and of itself will not warrant a finding that the agreement is a security interest. Therefore, under the first tier the economic realities show the agreement to be a "true lease".

The profit should always equal or exceed the comparable interest return which a lender would receive for the use of money in a true financing agreement. Therefore, it makes little or no sense to rely heavily on the "first tier"; except for short term leases (car rentals and equipment rentals), all or almost all commercial leases will look like financing agreements. Here, for example, the "finance charge" equals or exceeds the very highest equivalent commercial loan rate (it is at least 15%).

The second tier concerns the lessee's option to purchase the leased equipment. If the agreement provides, upon compliance with the terms of the lease, that the lessee shall become, or has the option to become, the owner of the property for no additional consideration or for a nominal consideration, the court is compelled as a matter of law to find that the lease is intended as a security interest. *See Federal Sign and Signal Corp. v. Berry,* 601 S.W.2d 137, 139 (Tex.Civ.App.—Austin, 1980, no writ); *Tackett v. Mid–Continent Refrigeration Co.,* 579 S.W.2d 545, 548 (Tex.Civ.App.—Fort Worth, 1979, writ ref'd n.r.e.); Tex Bus. & Comm.Code Ann. 1.201(37) (Tex. UCC) (Vernon Supp.1987). As previously stated, Article 13.01 of the Lease provided for a purchase option of the leased goods. The purchase price would be the agreed fair market value of the equipment at the

time the option was exercised. The determination as to what is a nominal sum has been the subject of much controversy in bankruptcy courts. Courts have held the sum of $1.00 to be a nominal amount. *See In re Vailancourt* 7 U.C.C.Rep. 748, 759 (D.Maine 1970); *but see National Equipment Rental Ltd. v. Priority Electronics Corp.* 435 F.Supp. 236, 239 (E.D.N.Y.1977) (if fair market value of equipment at end of lease was $1.00 and $1.00 is option price, then $1.00 is not nominal consideration).

The question then is how to determine what is nominal. The most common approach has been to compare the option price to the fair market value of the equipment. If the two figures are basically equal then the option price is not nominal and the lease payment are compensation for use of the equipment. *See e.g., In re Marhoefer Packing Co.,* 674 F.2d 1139, 1144–45 (7th Cir.1982); *Matter of Fashion Optical Ltd.,* 653 F.2d 1385, 1390–91 (10th Cir.1981); *In re Washington Processing Co., Inc.,* 3 U.C.C.Rep. 475, 478 (S.D.Cal. 1966); *National Equipment* 435 F.Supp. at 239; *FMA Financial Corp. v. Pro-Printers,* 25 U.C.C.Rep. 950, 954 (Utah 1979).

The second approach the courts have taken in determining what is nominal is comparing the option price as a percentage of 1) the original cost, 2) the total lease payments, or 3) the fair market value. The percentage method makes the determination of what is nominal too subjective. As the cases cited in the Lessee's brief demonstrate, there is no uniformity as to what percentage is considered nominal. *See Percival Construction Co. v. Miller & Miller Auctioneers, Inc.,* 19 U.C.C.Rep. 244, 248–49 (10th Cir.1976) (25% of original cost); *In re Polaris Industries, Inc.,* 14 U.C.C.Rep. 182, 185–86 (E.D. Tenn.1973) (10% of original cost). This Court determines that the more objective method of comparing the option price to the fair market value is the correct approach to take. The Lease clearly states that the option price would be the agreed fair market value at the time the option was exercised. Thus, following the weight of case law and common sense, the fair market value of the equipment in the case at hand is considered more than nominal consideration.

Here, although the Lessor had informed the Lessee that the "projected" fair market price would be ten percent of cost, there does not appear as a matter of law to have been an express, pre-lease agreement fixing fair market price. Such an agreement would clearly violate the rational of a "market price," objective rule, concerning the purchase option issue.

The third tier of the analysis is the court's inquiry into whether the Lessor effectively bargained away his absolute right to regain possession or control of the leased equipment. *See In re Peacock,* 6 B.R. at 925. When the Lessor has the right to retake control over and use of the leased property, then a "true lease" may be inferred by the court. *See Matter of Tillery,* 571 F.2d 1361, 1363 (5th Cir.1978). Conversely, if it can be shown that the lessor has no right to retake control over the leased goods, and the lessee acquired a proprietary interest in them, this will evidence a security interest. *See In the Matter of Anton's Lounge & Restaurant, Inc.,* 40 B.R. 134, 135 (Bankr.E.D. Mich.1984). The court in *In re Peacock* set out the three ways in which the lessor can effectively bargain way his absolute right of control over the goods: 1) the obligation to dispose; 2) the reasonably anticipated option; or 3) the useful life lease. *See In re Peacock,* 6 B.R. at 925–26.

First, if the lease provides that at the termination of the lease, the lessee is obligated to dispose of the property, and the lessee is entitled to any profit and bears any loss resulting from such disposition, then the lessee has acquired equity in the leased goods. The lessor has bargained away his right to absolute control. *See Matter of Tillery,* 571 F.2d at 1363. Article 11 of the Lease clearly states that the Lessee shall have no right, title or interest in leased goods; as such, the Lessee has no equity in the equipment. If the Lessee chose not to exercise its purchase option, then the Lessor would be obligated to retake possession of the hardware and software, dispose of it, and would not have to

account for the proceeds. Therefore, Chase Leasing and not P.W.L. Investments has the obligation for final disposition of the property.

Second, when a lease provides for a purchase option and the court finds that the parties could have reasonably anticipated that the option would be exercised, then that is persuasive evidence that the lease is intended as a security interest. *See In re Peacock* 6 B.R. at 926. In the instant case, it has been established that the option price was the fair market value of the equipment and that unless the option is exercised the Lessee has no interest in the equipment. Since the subject matter of the lease is computer hardware and software, items known for their rapid decline in value (or obsolescence), the Lessee would not make its determination as to purchase or return the leased goods to Chase Leasing until the time the option would be exercised. The Lessee would examine the new hardware and software on the market and decide what would be in its best interest. In turn, Chase Leasing could be left with unleaseable or unsellable goods. Thus, it can not be said that exercising the option would be the Lessee's "only sensible alternative." Put another way, the risk of obsolescence is on both parties. Neither benefits from the "market value" purchase option.

The third method by which the lessor could bargain away his absolute right to retake possession or control is where the lessee retains the property for its entire useful life, leaving the lessor with no significant residual value. *See Leasing Service Corp. v. American National Bank & Trust Co.,* 19 U.C.C. Rep. 252, 256 (D.N.J. 1976). In the case at bar, the primary term of the lease was for five years with a one year renewal option, a total possible lease period of six years. The undisputed evidence at trial established that the useful life of the leased goods was ten years, twice the length of the primary term of the lease. "Useful life" and value at end of term are not interchangeable in this case. The computer hardware and software may have little value to a third party at the end of the lease term, but the leased equipment will still be functional. Additionally, the

Transfer of Investment Tax Credit set the useful life at ten years, a document which P.W.L. Investments accepted. Therefore, Chase Leasing did not relinquish its rights in the equipment for more than half of its expected useful life. Consequently, it cannot be shown that under any of the three tests set out in the third tier, Chase Leasing effectively bargained away the right of absolute control.

After having gone through the three tiered analysis as set out by case law, this Court finds it important to look at the intent of the parties and the economic realities of the agreement before a final determination can be made. The true intent of the parties can only be ascertained by examining the agreement as a whole. Several courts have set forth the factors which should be considered when determining whether the intent of the parties was for the agreement to be a lease or a security interest. *See e.g. Matter of Fashion Optical, Ltd.,* 653 F.2d 1385, 1389 (10th Cir. 1981); *In re Brookside Drugstore,* 3 B.R. 120, 122–23 (D.Conn.1980); *In re International Plastics,* 18 B.R. 583, 586 (Bankr.D. Kan.1982). If upon a balancing of these factors, the weight favors the lessee, then the agreement is in reality a "true lease." If on the other hand, the balance tips toward a security interest, then the agreement is a disguised sale.

Factors indicative that the agreement is a lease include the following:

1. whether the total amount of the lease payments is reasonable given wear, tear, and obsolescence of the equipment,

2. whether the purchase option price of the equipment at the end of the lease is approximately equal to its fair market value,

3. whether the lessor is in the business of leasing goods of the type involved in the agreement,

4. whether the lessee acquires no equity in the equipment during the lease,

5. whether the useful life of the equipment exceed the term of the lease,

Factors which indicate that the agreement is a security interest include the following:

1. whether the lessee bears the risk of loss,

2. whether the lessee is required to pay the taxes and insurance on the equipment,

3. whether the equipment subject to the agreement was selected by the lessee from a third party and purchased by the lessor for this specific lessee,

4. whether the lessee must make a substantial non-refundable deposit,

5. whether the lessor discounts the lease at a bank or similar institution,

6. whether warranties generally found in a lease a excluded by the agreement,

7. whether the agreement permits the lessee to purchase the property at a nominal price at the end of the primary term,

8. whether there was a provision in the agreement for liquidated damages,

9. whether the agreement permits the lessor to file a UCC financing statement.

First, in the present case, the figures show that the lessor is being compensated for his capital outlay and the decrease in value of his assets. It has already been established that the monthly payments P.W.L. Investments was obligated to make amounted to the initial cost of the equipment plus a profit to Chase Leasing. This profit is compensation for its operating costs, investments in the equipment, and the loss it might suffer at the termination of the Lease if the equipment had decreased substantially in value. The purchase option price set by the Lease is whatever the fair market value of the equipment is at the time the option is exercised. The Lease specifically states that P.W.L. Investments shall acquire no rights or interests in the leased goods. Testimony at the the hearing established that the useful life of the equipment was ten years while the primary lease term was only five. Therefore, each factor required to establish that the intent of the parties was to execute a lease is present.

Now the Court will consider the factors tending to evidence a security interest. The Lease places the risk of loss on the Lessee as well as a requirement that the Lessee keep the equipment fully insured. While tending to show a security interest, this also shows that the Lessee was required to insure the equipment to cover itself in the event of any loss. The hardware and software which are the subject of the Lease had been selected by the Lessee prior to any contacts with the Lessor. Because the needs of the Lessee were so specialized, it would be reasonable for the Lessee to select the equipment from a third party vendor himself. The Lease required a ten percent refundable deposit to be made by the Lessee to the Lessor. The Lessor is in the sole business of leasing equipment and never discounted the agreement to a bank. The Lease does disclaim all warranties, express and implied; a term generally found. As stated above, the purchase option was set at the fair market value of the equipment and thus, was not nominal. The Lease does not make provisions for liquidated damages. Finally, Chase Leasing did file a UCC financing statement. Again, while these facts tend to show a security interest, they also reflect prudent business decisions designed to protect Chase Leasing under all contingencies.

Although certain factors surrounding the instant transaction have been held to evidence a security interest by some courts (Lessee's duty to insure, pay the taxes, and bear the risk of loss, and the Lessor's disclaimer of warranties) these factors are essentially matters of contract negotiation. *See In re Peacock*, 6 B.R. at 926–27. Therefore, when the evidence supporting a "true lease" is balanced against that supporting a security interest, the scale tilts to the side of a "true lease."

Applying the three tier analysis to the agreement at hand, this Court makes the following conclusions. The first tier requires a finding that there was a definite obligation to pay rentals equal the purchase price plus a financing factor. The agreement called for total payments of $107,904.60 of which $29,199.60 was profit to be paid over five years on highly depreciable assets. This evidences a "true lease". The second tier calls for a purchase option

that is for nominal consideration or no consideration. The fair market value of the equipment at the time the option is exercised is more than nominal consideration, again evidencing a "true lease." Under the third tier, the lessor must have bargained away his right to retake control of the leased equipment. The evidence established that the Lessor at all times retained ownership of the equipment, the useful life exceeded the lease term, and that the Lessee acquired no equity. Applying the third tier, this agreement is a "true lease." When the intent of the parties is taken into account and the economics of business are applied, the agreement is a "true lease." Consequently, this Court finds that the Master Business Equipment Lease entered into between Chase Leasing and P.W.L. Investments is a true lease.