### In re The TORGERSON COMPANY, Debtor.

### DEUTSCHE CREDIT CORPORATION, Plaintiff,

### v.

### John Patrick LOWE, Trustee for the Torgerson Company, and Miller Leasing Company, Inc., Defendants.

### Bankruptcy No. 89–50303–RBK. Adv. No. 89–5117–RBK.

United States Bankruptcy Court, W.D. Texas, San Antonio Division.

May 29, 1990.

900

Kimberly L. Allen, Gresham, Davis, Gregory, Worthy & Moore, San Antonio, Tex., for plaintiff, Deutsche Credit Corp.

Patrick H. Autry, Matthews & Branscomb, San Antonio, Tex., for John Patrick Lowe, trustee for the Torgerson Co.

Michael R. Hedges, Law Office of Michael R. Hedges, San Antonio, Tex., for the defendant, Miller Leasing Co., Inc.

## OPINION

RONALD B. KING, Bankruptcy Judge.

Deutsche Credit Corporation ("Deutsche Credit"), a creditor of the Debtor, The Torgerson Company ("Torgerson"), initiated this adversary proceeding by filing its "Complaint to Determine Property of the Estate and Validity, Priority and Extent of Lien" shortly after the case was converted from Chapter 11 to Chapter 7. The central issue is whether Deutsche Credit's lien or the lease of Miller Leasing Company ("Miller Leasing") has priority in connection with a Coyote C72B loader (the "loader") which Torgerson originally purchased. Judgment will be rendered in favor of Deutsche Credit for the reasons stated herein.

On May 21, 1986, Deutsche Credit and Torgerson entered into a Dealer Wholesale Inventory Financing Agreement. On June 10, 1986, Deutsche Credit filed its UCC–1 Financing Statement with the Secretary of State of Texas to perfect its interest in "all new equipment manufactured by Coyote Loader Sales, Inc. ... now owned or hereafter acquired by debtor [Torgerson]." On December 16, 1987, Torgerson purchased a Coyote C72B loader for $144,943.00 from Coyote Loader Sales, Inc. This purchase was financed by Deutsche Credit under its floor plan agreement with Torgerson. In addition, the parties executed a Note and Supplemental Security Agreement dated December 16, 1987, which specifically described the loader.

On January 30, 1989, Miller Leasing entered into an arrangement with Torgerson to purchase the loader for $140,000.00. Prior to the sale, on January 26, 1989, Torgerson and Miller Leasing executed an agreement for the lease of the loader from Miller Leasing to Torgerson for 48 months at $3,896.30 per month. Shortly after the sale leaseback agreement was entered into, Miller Leasing filed its own UCC–1 financing statement with the Secretary of State of Texas. Stephen Miller, president of Miller Leasing, testified that at no time prior to the sale-leaseback did he or anyone on his behalf search the Secretary of State's records to determine whether another UCC–1 financing statement was on file which included the loader either as inventory or equipment.

The Chapter 7 Trustee, John Patrick Lowe, is now the owner of whatever rights Torgerson had in the loader. The Trustee takes no position in this proceeding, and filed a stipulation stating that he will be bound by the Court's decision. The dispute is whether the Deutsche Credit lien or the Miller Leasing lease has priority with respect to the loader.

## I. Adequate Description of Collateral.

The first issue is whether Deutsche Credit adequately described the loader in its UCC–1. In its UCC–1 description,

Deutsche Credit claimed a security interest in the following:

> All new *equipment manufactured* by *Coyote Loader Sales, Inc.*, attachments, accessories, and replacement parts therefor now owned or hereafter acquired by debtor, and all used equipment and attachments including trade-ins thereto, in which said debtor has granted to Deutsche Credit Corporation a security interest, and all proceeds of collateral including but not limited to cash accounts, instruments, documents, chattel paper, security agreements, and goods.

(Emphasis added). Miller Leasing contends that Deutsche Credit's UCC–1 description was fatally defective in two respects. First, Coyote Loader Sales, Inc. was not the actual "manufacturer" of the collateral. Second, Torgerson held the loader as inventory rather than "equipment."

### A. General requirements of notice filing.

Official Comment 2 to section 9.402 of the Texas Business and Commerce Code states that the Uniform Commercial Code adopts the system of "notice filing," which is not the filing of the security agreement itself, but only a simple notice which may be filed before or after the security interest attaches. The notice indicates merely that the secured party who filed the UCC–1 financing statement may have a security interest in the collateral described. Further inquiry from the parties involved is necessary to disclose the complete state of affairs. Tex.Bus. & Com.Code Ann. § 9.402, comment 2 (Tex. UCC) (Vernon Supp.1990).

The description of the property in the financing statement is required only to put a third party on notice that there *may* be a security interest in the debtor's property. *Marine Drilling Co. v. Hobbs Trailers, Div. of Fruehauf Corp.*, 697 S.W.2d 831, 833 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.); *Villa v. Alvarado State Bank*, 611 S.W.2d 483, 487 (Tex.Civ.App.—Waco 1981, no writ). It is not essential that the description be so specific that the property can be identified by it alone, if the

description provides a method of inquiry or means of identification which, if pursued, will disclose the property that is covered. *Finger Furniture Co. v. Chase Manhattan Bank*, 413 S.W.2d 131, 135 (Tex.Civ. App.—San Antonio 1967, writ ref'd n.r.e.). In addition, section 9.110 of the Texas Business and Commerce Code provides:

> Except as provided in Subsections (c) and (f) of Section 9.402, any description of personal property or real estate is sufficient for the purposes of this chapter whether or not it is specific if it reasonably identifies what is described.

■ Tex.Bus. & Com.Code Ann. § 9.110 (Tex. UCC) (Vernon Supp.1990). Section 9.402(h) further provides:

> A financing statement substantially complying with the requirements of this section is effective even though it contains minor errors which are not seriously misleading.

Tex.Bus. & Com.Code Ann. § 9.402(h) (Tex. UCC) (Vernon Supp.1990). The critical inquiry, therefore, in assessing whether a security interest is perfected is whether a reasonably prudent creditor would have discovered the prior security interest. *In re McBee*, 714 F.2d 1316, 1321 (5th Cir. 1983).

B. Adequacy of description of manufacturer or brand.

■ Miller Leasing argues that Deutsche Credit's reference to Coyote Loader Sales, Inc. as the manufacturer does not adequately describe the loader. Although Deutsche Credit's UCC–1 financing statement states that it covers goods manufactured by Coyote Loader Sales, Inc., all goods sold under the "Coyote" name in the United States are manufactured by Zettelmeyer Baumaschinen GmbH, a West German corporation. The equipment is embossed with the Coyote logo, however, and the accompanying literature refers only to Coyote Loader Sales, Inc.

Miller Leasing's president, Mr. Miller, stated in his deposition and at trial that he had purchased "Coyote equipment" from Torgerson on other occasions. The Miller lease, the Miller UCC–1 financing statement and the Miller check to Torgerson clearly state that the sale and leaseback were for a "Coyote C–72 loader." It appears that a reference on a UCC–1 financing statement to the loader in question as a Zettelmeyer Baumaschinen GmbH loader rather than a Coyote loader could be more misleading because these particular loaders are known exclusively as Coyote loaders in the United States. A reasonably prudent person who reviewed the UCC–1 filings would have discovered the prior security interest. *Marine Drilling*, 697 S.W.2d at 834. The description of the manufacturer as Coyote, therefore, was adequate.

C. Adequacy of classification of collateral.

■ The second issue relates to Deutsche Credit's classification of the Coyote loader as "equipment" in its UCC–1 description. Section 9.109 of the Texas Business & Commerce Code sets forth the classifications of goods as consumer goods, equipment, farm products, and inventory.[1] As stated above, the Deutsche Credit UCC–1 financing statement claimed an interest in "all new equipment manufactured

---

1. Tex.Bus. & Com.Code Ann. § 9.109 (Tex. UCC) (Vernon Supp.1990), provides, in pertinent part:
   Goods are....
   (2) "equipment" if they are used or bought for use primarily in business (including farming or a profession) or by a debtor who is a non-profit organization or a governmental subdivision or agency or if the goods are not included in the definitions of inventory, farm products or consumer goods;
   \*   \*   \*   \*   \*   \*

   (4) "inventory" if they are held by a person who holds them for sale or lease or to be furnished under contracts of service or if he has so furnished them, or if they are raw materials, work in process or materials used or consumed in a business. Inventory of a person is not to be classified as his equipment.

by Coyote Loader Sales, Inc." Although the loader is a piece of equipment in its generic sense, it was actually held by Torgerson for sale or lease to a third party. As such, the loader would more correctly be classified as inventory rather than equipment because Torgerson was in the business of selling or leasing loaders and other types of machinery. Therefore, Miller Leasing maintains that Deutsche Credit's failure to properly classify the loader as inventory rather than equipment makes the UCC–1 description inadequate and ineffective.

The official comment to section 9.110 of the Texas Business & Commerce Code states that "[t]he test of sufficiency of a description laid down by this Section is that the description do the job assigned to it—that it make possible the identification of the thing described." Tex.Bus. & Com. Code Ann. § 9.110, official comment (Tex. UCC) (Vernon Supp.1990). One Texas case has held a similar discrepancy in classification to be a sufficient description so long as a potential purchaser is put on notice that a secured party may have a security interest. *Stone Fort Nat'l Bank v. Citizen's State Bank*, 722 S.W.2d 508 (Tex.App.—Beaumont 1986, no writ) (security interest in "all inventory" included piece of equipment not held for immediate sale); *see generally Unicut v. Texas Com. Bank*, 704 S.W.2d 442 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.); *McGehee v. Exchange Bank & Trust Co.*, 561 S.W.2d 926 (Tex. Civ.App.—Waco 1978, writ ref'd n.r.e.).

Regardless of whether the Coyote loader was classified as inventory or equipment, the UCC–1 financing statements for both types of goods would be located in the same file in the Secretary of State's office. If the UCC–1 filings were searched for a security interest in Coyote machinery un-

der the name "Torgerson," the UCC–1 financing statement filed by Deutsche Credit would have appeared. "[E]quipment manufactured by Coyote Loader Sales, Inc." reasonably describes a Coyote loader held by Torgerson. A reasonably prudent person, after reading the UCC–1 description, would inquire as to the extent of the security interest identified in the UCC–1 financing statement if he had plans to finance or purchase a Coyote loader of Torgerson's. The description of the collateral, though not perfect, was sufficient to put an ordinarily prudent person on notice of the security interest claimed by Deutsche Credit.

## II. True Lease or Security Arrangement?

■ Miller Leasing's next argument is that the sale of the loader by Torgerson to Miller Leasing was a sale in the ordinary course of business which cut off preexisting liens under Tex.Bus. & Com.Code Ann. § 9.307(a) (Tex. UCC) (Vernon Supp.1990). Because Deutsche Credit had a perfected security interest in the loader, a sale would be the only means by which Miller Leasing could have cut off that security interest. A sale did not occur, however, if the sale leaseback transaction was in reality a disguised financing arrangement. *In re Teel*, 9 B.R. 85, 87 (Bankr.N.D.Tex.1981). The arrangement between Miller Leasing and Torgerson relating to the loader had to be a true lease in order for the Court to find that an actual *sale* of the loader took place.[2]

While the Bankruptcy Code does not define a "lease," it does define a "security interest" as a lien created by an agreement. 11 U.S.C. § 101(45) (1982 & Supp. V 1987). In the legislative history, Congress stated that "[w]hether a consignment or a lease constitutes a security interest under the bankruptcy code will depend on wheth-

---

**2.** There is nothing questionable about acquiring personal property for business use by a lease with a purchase option. There are valid business, accounting and tax reasons to use a lease with a purchase option, rather than a loan and security agreement. The borrowing of money by a lessee to purchase equipment can deplete lines of credit or borrowing authority which can be avoided by entering into lease agreements. Similarly, lease payments under true leases are treated as fully deductible business expenses for federal income tax purposes, rather than allowing a deduction only for depreciation and interest costs for the financing of the purchase of equipment. By entering into a lease agreement, the lessee has the income tax advantages of deductibility of payments, and financial accounting advantages of classification of the obligation as a current expense rather than depletion of capital and long term debt.

er it constitutes a security interest under applicable State or local law." H.R.Rep. No. 595, 95th Cong., 1st Sess. 313–14, *reprinted in* 1978 U.S.Code Cong. & Admin. News 5787, 6270–6271. The Bankruptcy Courts in Texas have looked to section 1.201(37) of the Texas Business and Commerce Code and to the case law from other jurisdictions to establish a three tier test to determine whether a transaction is a "true lease" or a financing arrangement.[3] *Sunset Enterprises, Inc. v. B & B Coal Co. (In re Sunset Enterprises, Inc.)*, 38 B.R. 712, 715–717 (W.D.Va.1984), *aff'd*, 798 F.2d 1409 (4th Cir.1986); *In re P.W.L. Inv., Inc.*, 92 B.R. 680, 681 (Bankr.W.D.Tex.1987); *Teel*, 9 B.R. at 87; *In re Peacock*, 6 B.R. 922, 924 (Bankr.N.D.Tex.1980). The three tiers are:

1. The finding of a definite obligation to pay rentals during the lease term in an amount substantially equivalent to the fair market value of the leased goods plus a financing charge;

2. An option to become the owner of the leased property at the end of the lease for no consideration or for a nominal consideration; and

3. Whether the lessor has effectively bargained away the absolute right to retake control of the leased goods.

*Peacock*, 6 B.R. at 924–925.

A. Definite obligation to pay.

To satisfy the first tier, it must be shown that the lessee is under an absolute obligation to make regular payments to the lessor for the value of the leased goods plus a financing charge. In this case, it is undisputed that Torgerson agreed to make forty-eight (48) monthly lease payments of $3,896.30 each. The payments during the primary term of the lease totaled $187,-022.40, which was $47,022.40 in excess of Miller Leasing's purchase price of $140,-

000.00. In the current market place, most personal property leases will provide for the lessor to recoup its initial investment plus a profit. *P.W.L.*, 92 B.R. at 682. This factor generally indicates a financing arrangement.

B. Option to purchase.

The second tier of the test examines whether or not the lessee may obtain ownership at the end of the lease without any additional consideration or for a nominal consideration. The lease provided for a purchase option equal to the "fair market value" of the leased item at the end of the primary lease term. No dollar option price was listed. At the trial, Vernon Torgerson, president of The Torgerson Company, testified that at the end of his many leases with Miller Leasing, he *never returned a piece of equipment.* He also testified that it was his understanding that he would keep the loader in question at the end of the lease term without having to make any additional payments. Otherwise, he would not have entered into the lease.

Mr. Miller testified that Torgerson returned the lease equipment at the end of the various leases in only 12 of the 74 leases. Although some leases were occasionally renewed, Torgerson usually retained the equipment after the expiration of the lease for no consideration or a nominal consideration. In some instances in which the leases were not renewed, Miller Leasing often kept the security deposit, which usually was the last month's rent, as the purchase option price. In several instances, Torgerson paid nothing to exercise the "fair market value" purchase option on the equipment. As a result, although the lease in question provided for a "fair market value" purchase option price at the end of the lease, the course of dealing between

3. "Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation. Unless a lease or consignment is intended as security, reservation of title thereunder is not a "security interest" ... Whether a lease is intended as security is to be determined by the facts of each case; however, (A) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (B) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security. Tex.Bus. & Com.Code Ann. § 1.201(37) (Tex. UCC) (Vernon Supp.1990).

the parties indicated that a nominal purchase option price would be paid. The Court finds that Torgerson had the option to become the owner of the loader at the expiration of the lease for no consideration or for a nominal consideration.

C. Right to retake control.

Under the third tier of the test, the Court must determine whether the lessor has effectively bargained away the absolute right to retake control of leased property. The Court in *Peacock* set out the three methods by which the lessor can effectively bargain away his absolute right of control over the goods: 1) the obligation to dispose; 2) the reasonably anticipated option; and 3) the useful life lease. *Peacock,* 6 B.R. at 925.

1. The first method by which the lessor can bargain away his absolute right to retake control of the leased goods was described in *In re Tillery,* 571 F.2d 1361 (5th Cir.1978). The court held in *Tillery* that although the lessor was obligated to dispose of the property, the lessee was entitled to any profit and bore any loss from disposition of the leased item. *Id.* at 1365. The lessee, therefore, acquired equity in the leased goods and the lessor bargained away his absolute right of control. Paragraph 6 of the Miller lease stated that at the end of the lease, the lessee shall return the leased goods to Miller Leasing or the lessee may exercise an option to purchase the leased goods in an amount not to exceed the fair market value of the leased goods. At the end of the lease, Miller Leasing was obligated to take possession and control of the loader if Torgerson did not exercise its purchase option. In addition, Miller Leasing bore any financial gain or loss from the disposition of the leased goods to a third party. This placed the obligation to dispose of the leased goods upon Miller Leasing.

2. The second method by which the lessor can bargain away his absolute right to retake control is when a lease provides for a purchase option and the court finds that the parties reasonably anticipated that the option would be exercised, or that the lessee is left with "no sensible alternative"

but to exercise the option. When that occurs, it appears that the lease was intended as a security interest. *P.W.L.,* 92 B.R. at 684; *Peacock,* 6 B.R. at 926. As stated previously, the purchase option was almost always exercised in the usual course of dealing between Miller Leasing and Torgerson. Mr. Torgerson testified that he would not have entered into the lease had it not been for the purchase option which he traditionally exercised for nominal consideration. Miller Leasing did not expect to obtain possession of the equipment upon expiration of the lease. Therefore, the Court finds that the parties reasonably anticipated that Torgerson would exercise the purchase option on the loader.

3. The third method by which the lessor can bargain away his absolute right to retake possession or control is where the lessee retains the property for its entire useful life. *P.W.L.,* 92 B.R. at 684; *see also In re Marhoefer Packing Co.,* 674 F.2d 1139, 1145 (7th Cir.1982). At the trial, Mr. Torgerson stated that the useful life of the loader could be as short as four to six years, depending on what type of work for which the loader was used. On the other hand, Miller Leasing's expert witness testified that if properly maintained, the loader would have a useful life of ten to fifteen years. Based upon this testimony, it is the opinion of the Court that the useful life of the loader exceeded the term of the lease. Although the useful life exceeded the term of the lease, however, Miller Leasing bargained away its absolute right to retake control of the loader by the course of dealing relating to the purchase option.

D. Lease and financing arrangement factors.

In addition to the three tier test, some courts have gone further and have considered the economic realities to determine whether the agreement was a lease or financing arrangement. *P.W.L.,* 92 B.R. at 684. As argued by both Deutsche Credit and Miller Leasing, the Court should consider the following factors to indicate a lease:

1. whether the total amount of the lease payments is reasonable given wear, tear, and obsolescence of the equipment;

2. whether the purchase option price of the equipment at the end of the lease is approximately equal to its fair market value;

3. whether the lessor is in the business of leasing goods of the type involved in the agreement;

4. whether the lessee acquires no equity in the equipment during the lease; and

5. whether the useful life of the equipment exceeds the term of the lease.

In addition, the following factors should be considered to indicate a financing arrangement:

1. whether the lessee bears the risk of loss;

2. whether the lessee is required to pay the taxes and insurance on the equipment;

3. whether the equipment subject to the agreement was selected by the lessee from a third party and purchased by the lessor for this specific lessee;

4. whether the lessee must make a substantial non-refundable deposit;

5. whether the lessor discounts the lease at a bank or similar institution;

6. whether warranties generally found in a lease are excluded by the agreement;

7. whether the agreement permits the lessee to purchase the property at a nominal price at the end of the primary term;

8. whether there was a provision in the agreement for liquidated damages; and

9. whether the agreement permits the lessor to file a UCC–1 financing statement.

*P.W.L.*, 92 B.R. at 684–685.

In addressing the factors which indicate a lease, the lease payments equaled the purchase price of $140,000.00 plus fifteen percent interest, or $47,022.40 in profit over four years. The parties' course of dealing established that the purchase options were normally exercised for a nominal consideration, usually either for the last month's rent or no additional payment. Mr. Miller testified that he was in the business of leasing goods to several companies, including Torgerson, but that he did not maintain a showroom or an inventory. Although the lease did not expressly provide for Torgerson to acquire any equity in the loader during the life of the lease, Torgerson had the right to purchase the leased item for a nominal consideration. It could be concluded, therefore, that Torgerson acquired equity. The final factor is the useful life of the leased item, which in this case exceeded the primary term of the lease. Therefore, in considering all of the "lease" factors, the economic reality of this transaction does not indicate a lease.

The second set of factors to consider are those which tend to indicate a financing arrangement. The lease required that the lessee provide insurance and pay all taxes on the loader. Consequently, Torgerson bore the full risk of the loss as provided in paragraph 7 of the lease. With respect to the third factor of who selected the leased equipment, not only did Torgerson select the equipment, but the loader was already owned by Torgerson as part of its inventory. Miller Leasing did not go out into the open market and purchase it from a third party vendor. Thus, this was a sale lease-back transaction by which Torgerson attempted to increase its immediate cash flow, and later repay the cash advanced by Miller Leasing out of Torgerson's own future rental income. While Mr. Miller testified that he did not "discount" the lease to a bank, he did testify that he collaterally assigned the lease to a bank. In addition, the lease gave Torgerson only those warranties granted by the manufacturer. All repairs and maintenance were the responsibility of Torgerson. As has already been established, the purchase option was usually exercised for a nominal amount. With respect to liquidated damages, the lease provided that upon default, Miller Leasing could accelerate *all* future unpaid rentals under the lease so that they would be im-

mediately due and payable. In addition, Miller Leasing filed a UCC–1 financing statement with the Secretary of State.

In looking at all of the financing arrangement factors, the clear indication is that the transaction was in reality a financing arrangement. Consequently, under the three tier test, as well as the lease and financing arrangement factors, there was no "sale" of the loader to Miller Leasing.

## CONCLUSION

For the reasons stated, the Court finds that the Deutsche Credit UCC–1 financing statement contained a sufficient description of the collateral to perfect its prior security interest in the loader. The Court also finds that the Miller Leasing sale leaseback transaction was a disguised financing arrangement, rather than a sale in the ordinary course of business. Deutsche Credit's perfected security interest, therefore, has priority over the perfected security interest of Miller Leasing. Judgment will, therefore, be rendered in favor of Deutsche Credit. This opinion shall constitute the findings of fact and conclusions of law of the Court pursuant to Bankruptcy Rule 7052.