SEYMOUR, Circuit Judge.
 

 The district court affirmed a bankruptcy court order holding a transfer from bankrupt Fashion Optical, Ltd. to defendant Dr. Gebetsberger to be neither a fraudulent conveyance nor a transfer intended as Security. Both courts held the transfer to be a true lease. The trustee in bankruptcy appeals. We reverse and remand for further proceedings.
 

 The dispute between the trustee and Ge-betsberger centers on a purported sale and leaseback of equipment. As part of the transaction, bankrupt sent a bill of sale dated June 23, 1977 whereby bankrupt sold Gebetsberger $53,280 of optical equipment. On June 27, Gebetsberger paid $50,000 cash for this equipment. Some of the equipment, worth $7,265, was used and in bankrupt’s possession before and after the alleged sale. For this equipment, Gebetsber-ger paid $7,265 to bankrupt directly. The rest, worth $42,735, was new equipment being sold by a company named Coburn Optical Industries, Inc. Bankrupt Optical had originally ordered this new equipment from Coburn but its cheeks sent to Coburn in payment were returned for insufficient funds. Thereupon, Gebetsberger, a business associate and friend of bankrupt Optical’s president, Mr. William Daniel, intervened to pay Coburn $42,375 directly.
 

 The equipment was never physically delivered to Gebetsberger. It passed directly from Coburn Industries to bankrupt Optical’s premises where it has remained at all times relevant to this lawsuit.
 

 About a week after the purported sale, Gebetsberger entered into an agreement whereby he purported to lease back to bankrupt Optical both the $42,735 of new and the $7,265 of used equipment for 60
 
 *1387
 
 months at a rate of $1,000 per month, or a total “rental” price of $60,000. In addition, the agreement provided bankrupt with an option, exercisable at the end of the five years, to purchase the equipment for 10% of the equipment’s “original cost,”
 
 [1]
 
 or its fair market value at the end of the five-year term, whichever was greater. Of the $60,-000 called for by the agreement, Gebetsber-ger received $13,000, over a period of thirteen months before bankruptcy intervened. The last monthly payment to Gebetsberger was made in July 1978.
 

 Generally, the trustee challenges the sale and leaseback by contending that Gebets-berger and the president of bankrupt, though legally unrelated, were business cronies whose dealings misled bankrupt’s creditors. More specifically, the trustee contends that the purported sale and leaseback was (1) a fraudulent conveyance under Okla.Stat.Ann. tit. 24, § 6 and section 70(e)(1) of the Bankruptcy Act of 1898 (formerly 11 U.S.C. § 110(e)(1)), and (2) a transfer intended as security under Okla.Stat. Ann. tit. 12A § 1-201(37), rather than a true lease, and thus subject to the filing provisions in Article Nine of the Uniform Commercial Code. Regarding the latter, the parties agree that Gebetsberger did not perfect any security interest under the Code. Either theory, if correct, would require reversal of the lower court.
 

 The bankruptcy court found against the trustee on both theories. The district court affirmed on the ground that the bankruptcy judge’s fact findings were not clearly erroneous. However, we have concluded that the fraudulent conveyance issue was improperly decided under Okla.Stat.Ann. tit. 24, § 6, for we believe section 6 was repealed when Oklahoma adopted the Uniform Fraudulent Conveyance Act.
 
 See
 
 1965 Okla.Sess.Laws eh. 447, §§ 1-12 (codified at Okla.Stat.Ann. tit. 24, §§ 101-111). We have also concluded that the issue of true lease versus security interest was improperly resolved on this record. We therefore vacate the district court’s judgment and remand to the bankruptcy court for further proceedings consistent with this opinion.
 

 Fraudulent Conveyance
 

 Okla.Stat.Ann. tit. 24, § 6 provides:
 

 “Transfers of personalty — Presumption of fraud from retention of possession
 

 “Every transfer of personal property other than a thing in action, and every lien thereon, other than a mortgage, when allowed by law, ponclusively presumed [sic, is conclusively presumed], if made by a person having at the time the possession or control of the property, and not accompanied by an immediate delivery, and followed by an actual and continued change of possession of the things transferred, to be fraudulent and therefore void, against those who are his creditors while he remains in possession, and the successors in interest of such creditors, and against any person on whom his estate devolves in trust for the benefit of others than himself, and against purchasers or incumbrancers in good faith subsequent to the transfer.”
 

 This statute was enacted in 1910. Its aim is clear: to preclude the possibility of a debtor’s feigning ownership from the naked fact of possession, and thereby to combat one of the classic “badges of fraud” in the debtor-creditor relationship.
 
 See Twyne’s Case,
 
 76 Eng.Rep. 809 (Star Chamber 1601). Although section 6 in effect outlaws the conventional sale and leaseback, that was undisputedly the law in Oklahoma until June 29, 1965. On that date, the Oklahoma legislature enacted the Uniform Fraudulent Conveyances Act.
 
 See
 
 1965 Okla.Sess.Laws ch. 447, §§ 1 — 12 (codified at Okla.Stat.Ann. tit. 24, §§ 101-111).
 
 *1388
 
 Section 12 of the enactment repealed “[a]ll acts or parts of acts inconsistent with” the Uniform Act.
 
 Id.
 
 § 12. In essence, the Uniform Act prohibits certain conveyances by the debtor as fraudulent against his creditors if made either without fair consideration or with actual intent to defraud. The touchstone of the Act is absence of fair consideration or presence of intentional fraud.
 
 See generally Georgia-Pacific Corp. v. Lumber Products Co.,
 
 590 P.2d 661, 665 (Okl.1979). But unlike section 6, the Uniform Act does not automatically prohibit a sale and leaseback because it is quite possible for a debtor to sell some of his equipment in good faith and for fair consideration, and then to lease it back again on commercially unassailable terms. It follows that a statute such as section 6 with its draconian bar of sale and leaseback transactions cannot be harmonized with the Uniform Act’s scheme. We believe Oklahoma courts would so conclude. We hold that section 6 was effectively repealed in 1965 when the Uniform Act was passed.
 
 [2]
 

 Whether either the sale or the leaseback portion of the transaction in this case amounted to a fraudulent conveyance must be determined under the Uniform Act, Okla.Stat.Ann. tit. 24, §§ 101-111. Since up to now the record has been developed as if section 6 governed, we remand to the bankruptcy court so that it may pass upon this issue on a properly developed factual record.
 

 True Lease Versus Secured Transaction
 

 The trustee also challenges the June-July 1977 agreement between Gebetsberger and bankrupt by characterizing it as a secured transaction instead of a true lease. Under this view, Gebetsberger financed an installment sale of equipment to bankrupt and retained a security interest. Since Gebets-berger never perfected his interest, the trustee will prevail if he is correct.
 
 See
 
 Bankruptcy Act of 1898, § 70(c) (formerly 11 U.S.C. § 110(c)); Okla.Stat.Ann. tit. 12A, § 9-301(l)(b).
 

 Under Oklahoma’s version of the Uniform Commercial Code, “security interest”
 

 “means an interest in personal property or fixtures which secures payment or performance of an obligation. . . . Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.”
 

 Okla.Stat.Ann. tit. 12A, § 1-201(37). In essence, this section aims to prevent buyer and seller from masquerading their secured installment sale as a “lease,” thereby placing it beyond the reach of U.C.C. provisions governing secured transactions. Its language suggests a four-step approach under “the facts of each case,”
 
 id.,
 
 to determine whether a purported lease is in reality a secured transaction.
 

 First, the presence of a purchase option does not automatically preclude a finding of true lease. Second, if a purchase option exists and it or other terms in the “lease” permit the “lessee” to become full owner by merely paying no or nominal consideration after complying with its terms, the inquiry ends. The “lease” is deemed a secured transaction as a matter of law and thus subject to the provisions of U.C.C. Article Nine.
 
 See, e. g., Percival Construction Co. v. Miller & Miller Auctioneers, Inc.,
 
 532 F.2d 166, 171-72 (10th Cir. 1976),
 
 aff’g
 
 387 F.Supp. 882 (W.D.Okl.1973);
 
 Citicorp Leasing, Inc. v. Allied Institutional Distributors, Inc.,
 
 454 F.Supp. 511, 516 (W.D.Okl.
 
 *1389
 
 1977);
 
 Dynalectron Corp. v. Jack Richards Aircraft Co.,
 
 337 F.Supp. 659, 661 (W.D.Okl.1972). Third, if the option does require greater than nominal consideration for full ownership, a true lease is usually found.
 
 See, e. g., Crest Investment Trust, Inc. v. Atlantic Mobile Corp.,
 
 252 Md. 286, 250 A.2d 246, 249 (1969) (option price over 50% of list price);
 
 Xerox Corp. v. Smith,
 
 67 Misc.2d 752, 325 N.Y.S.2d 682, 682-83 (N.Y.Civ.Ct.1971) (option price 50% of list price).
 

 Finally, just as the inclusion in the “lease” of a purchase option does not of itself imply a secured installment sale, the exclusion of one does not automatically imply a true lease. Thus, even though nothing in the “lease” may permit purchase at nominal consideration, the “lease” will still be deemed one intended as security if the facts otherwise expose economic realities tending to confirm that a secured transfer of ownership is afoot.
 
 See, e. g., In re Tulsa Port Warehouse Co.,
 
 29 U.C.C.Rep.Serv. 1608, 1612-13 (N.D.Okl.1980);
 
 In re Brookside Drug Store, Inc.,
 
 3 B.R. 120, 29 U.C.C.Rep.Serv. 230, 234-36 (Bkrtcy.Conn.1980).
 

 Not surprisingly, this scheme for resolving the issue of true lease versus secured transaction has spawned considerable litigation.
 
 See generally
 
 J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code § 22-3, at 877-83 (2d ed. 1980). Under Oklahoma law the following factors tend to indicate a true lease:
 

 “(a) Provision specifying purchase option price which is approximately the market value at the time of the exercise of the option.
 

 “(b) Rental charges indicating an intention to compensate lessor for loss of value over the term of the lease due to aging, wear and obsolescence.
 

 “(c) Rentals which are not excessive and option purchase price which is not too low.
 

 “(d) Facts showing that the lessee is acquiring no equity in leased article during the term of lease.”
 

 Percival Construction Co. v. Miller & Miller Auctioneers, Inc.,
 
 387 F.Supp. 882, 885 (W.D.Okl.1973). And of the many factors
 
 [3]
 
 tending to indicate a financed installment sale to the “lessee” coupled with a creation of a security interest in the “lessor,” two relate directly to the consideration requirement of section 1-201(37):
 

 “The percentage that option purchase price bears to the list price, especially if it is less than 25% is to be considered as showing the intent of the parties to make a lease as security.
 

 “Where the terms of the lease and option to purchase are such that the only sensible course for the lessee at the end of the lease term is to exercise the option and become the owner of the goods, the lease was intended to create a security interest.”
 

 Percival,
 
 387 F.Supp. at 885,
 
 aff’d,
 
 532 F.2d at 171-72.
 

 In the present case, the “lease” gave bankrupt an option at the end of five years to purchase the optical equipment for the
 
 *1390
 
 greater of fair market value or 10% of $53,280, the equipment’s original cost. The record, however, contains no evidence on either the fair market value at any point along the equipment’s useful economic life or on the length of that useful life. Nevertheless, the bankruptcy court concluded:
 

 “The evidence established that it was the intent of the parties to enter into a lease agreement rather than a sale of equipment for the reason that a substantial (not merely nominal) payment was required on the part of the lessee if the option to purchase were exercised at the end of lease term.”
 

 Rec., vol. I, at 69. This conclusion, standing as it does without any evidence in the record from which to infer the equipment’s fair market value at the end of the five-year term, amounts to little more than a determination that bankrupt and Gebets-berger
 
 subjectively
 
 viewed their transaction as a lease. But that alone would not make a true lease of what economic realities might show to be a secured installment sale. To paraphrase Shakespeare’s words,
 
 [4]
 
 a secured transaction by any other name is still a secured transaction, and section 1-201(37) so recognizes.
 

 The “lease” between bankrupt and Ge-betsberger fixes the option price in terms of fair market value. But without evidence from which to infer such value at the time the option could be exercised, there is no way to tell whether the consideration requirement of section 1—201(37) has been contravened.
 
 See, e. g., Chandler Leasing Corp. v. Samoset Associates (In re Samoset Associates),
 
 24 U.C.C.Rep.Serv. 510, 516-17 (D.Me.1978);
 
 All-States Leasing Co. v. Ochs,
 
 42 Or.App. 319, 600 P.2d 899, 904 (1979);
 
 Davis Brothers v. Misco Leasing, Inc.,
 
 508 S.W.2d 908, 912 (Tex.Civ.App.1974). An absence of such evidence in this case is crucial because the facts do not otherwise confirm that the parties in reality entered into a security arrangement.
 

 The record here does show that the $60,-000 total “rentals” over five years would exceed the equipment’s original cost of $53,-280. Such excess would be one factor tending to indicate interest payments in a financed installment sale.
 
 See, e. g., National Equipment Rental, Ltd. v. Priority Electronics Corp.,
 
 435 F.Supp. 236, 239 (E.D.N.Y.1977);
 
 U. C. Leasing, Inc. v. Laughlin,
 
 606 P.2d 167, 170 (Nev.1980);
 
 O.P.M. Leasing Services, Inc. v. Homestead Fabrics, Inc.,
 
 18 U.C.C.Rep.Serv. 1342, 1344 (N.Y.Sup.Ct.1976). But the fact total “rentals” may exceed the price does not automatically eliminate the possibility of a true lease because if the parties reasonably anticipated the equipment’s market value to depreciate only slightly in five years, or indeed appreciate, the lease might well be found to require greater than nominal consideration for full ownership. Given the absence of evidence on market value, the rest of the evidence in the present record is as consistent with the view that a secured financing was intended as it is with the view that bankrupt decided to lease because it could not afford to buy.
 

 To apply section 1-201(37) on the present record without regard to evidence of fair market value, it would have to be deemed as a matter of law that either (1) the purchase option’s 10% alternative of itself calls for a consideration greater than nominal, or (2) setting the purchase option price to equal the fair market value at the time of exercise automatically satisfies the consideration requirement of section 1-201(37).
 
 Percival
 
 precludes the first possibility because it holds that if the option price is less than 25% of list price, the consideration is deemed nominal. Indeed, the option in
 
 Percival
 
 resulted in a payment by the “lessee” of 10.6% of the list price.
 
 See
 
 532 F.2d at 171. Regarding the second possibility, some courts disregard list price entirely and measure option price against fair market value at the moment the option is actually exercised.
 
 See, e. g., Peco, Inc. v. Hartbauer Tool & Die Co.,
 
 262 Or. 573, 500 P.2d 708, 710 (1972). Under such an approach,
 
 *1391
 
 the mere setting of option price equal to market value at the time of exercise might conceivably meet the consideration requirement of section 1-201(37). And perhaps this explains the bankruptcy court’s finding of “substantial” consideration. In our view, however, and the view we believe Oklahoma courts would adopt, the consideration requirement of section 1—201(37) cannot be met by merely providing an option to buy at “fair market value” without any regard to what that might turn out to be, because such value could conceivably fall to a nominal level, especially toward the latter part of an item’s useful economic life.
 
 National Equipment,
 
 435 F.Supp. 236, illustrates this point. That case dealt with a purchase option very similar to the one here. After seven years of monthly payments on certain computer equipment, the “lease” permitted purchase at the greater of fair market value or roughly 4% of the original cost to the “lessor.” The
 
 National Equipment
 
 court rejected an argument that an option price providing for a fixed dollar value “or the fair market value, whichever is greater,” 435 F.Supp. at 239, automatically meets the consideration requirement of section 1—201(37):
 

 “[I]n a case such as this one where the equipment will be essentially worthless at the end of the lease period, if a fair market value test was used, the parties could determine whether the agreement would be a lease or a sale by the simple expedient of including or excluding a ‘fair market value’ option purchase price such as the one in this case. In other words, the plaintiff would have us hold that even if the fair market value of the equipment at the end of the lease is one dollar and that is the option price, then one dollar is not ‘nominal consideration’ pnder the Code.”
 

 National Equipment,
 
 435 F.Supp. at 239. In short, section 1-201(37) seeks to preclude
 
 nominal
 
 consideration, not merely to ensure
 
 fair
 
 consideration.
 

 In view of the foregoing, it is necessary to remand this case to the bankruptcy court not only on the fraudulent conveyance issue as earlier stated, but on the true lease versus security interest issue as well so that evidence may be adduced on the equipment’s fair market value at the time the bankrupt could have exercised the option.
 

 Judgment of the district court vacated and case remanded to the bankruptcy court for further proceedings consistent with this opinion.
 

 [1]
 

 . It is not completely clear from the record whether this refers to the $50,000 total price actually paid by Gebetsberger or the $53,280 sum shown on the June 23, 1977 bill of sale for the equipment. We assume, without deciding, that “original cost” refers to $53,280.
 

 [2]
 

 . The last reported decision construing section 6 was rendered in 1962.
 
 See Benton v. Ortenberger,
 
 371 P.2d 715 (Okl.1962).
 

 [3]
 

 . Professors White and Summers have compiled the following factors for determining whether a transaction involves a true lease or security interest:
 

 “The lessor’s status as [professional] financier .... So, too, such factors as whether the lessee is required to insure the goods in favor of the lessor for a value equal to the total rental payments; the risk of loss or damage is on the lessee; the lessee is to pay for taxes, repairs and maintenance; there are default provisions governing acceleration and resale; a substantial, non-refundable deposit is required; the goods are to be selected from a third party by the lessee; the rental payments are equivalent to the cost of goods plus interest; the lessor lacks facilities to store or retake the goods; the lease is to be discounted with a bank; warranties normally found in a lease are excluded; the goods are fixtures impractical to remove.”
 

 J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code § 22-3, at 882-83 (2d ed. 1980) (footnotes omitted),
 
 quoted partly in United States ex rel. Eddies Sales and Leasing, Inc. v. Federal Ins. Co.,
 
 634 F.2d 1050, 1053 (10th Cir. 1980) (construing Okla.Stat.Ann. tit. 12A, § 1-201(37)).
 

 [4]
 

 . Romeo and Juliet,
 
 act III, sc. 2, 1. 43 (1596).