## In re TRIPLEX MARINE MAINTENANCE, INC., Debtor.

### No. 99–11858.

United States Bankruptcy Court, E.D. Texas, Beaumont Division.

Nov. 13, 2000.

Ronald E. Holub, Dallas, TX, for Commercial Money Center, Inc.

John Mayer, Ross, Banks, May, Cron & Cavin, P.C., Houston, TX, for Daniel J. Goldberg, Chapter 7 Trustee.

*MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART MOTION OF COMMERCIAL MONEY CENTER, INC., FOR RELIEF FROM THE AUTOMATIC STAY*

BILL G. PARKER, Bankruptcy Judge.

This matter is before the Court upon the Motion for Relief from Automatic Stay (the "Motion") filed by Commercial Money Centers, Inc., ("CMC") which seeks relief from the automatic stay in order to regain possession of virtually all of the Debtor's assets which were purportedly sold to CMC by the Debtor, Triplex Marine Maintenance, Inc. (the "Debtor"), and then allegedly leased by CMC back to the Debtor. Daniel Goldberg, Chapter 7 Trustee, objected to CMC's request for relief from the stay on the grounds that the two transactions between CMC and the Debtor created not true leases, but rather disguised secured interests in the Debtor's assets which CMC had failed to timely perfect prior to the commencement of the Debtor's Chapter 7 case.

### I. *JURISDICTION.*

The Court has jurisdiction to consider the Motion for Relief from Automatic Stay in this case pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a). The Court has the authority to enter a final order regarding this contested matter since it constitutes a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(A), (G) and (O).

### II. *FACTUAL AND PROCEDURAL BACKGROUND*

In late 1998, the Debtor, Triplex Marine Maintenance, Inc., was in need of immediate cash to pay off certain tax indebtedness to the Internal Revenue Service. According to the testimony of its president, Donna Lemaire, the Debtor first approached lending institutions with which it had previously done business to obtain the necessary money; however, these institutions were unwilling to extend the funds. The Debtor then approached its factoring company, Contractors' Capital, to determine alternative sources of financing. It was through Contractors' Capital that the Debtor became aware of the existence of CMC. CMC, according to the testimony of its representative, Mr. Brian McMichael, is in the "business of equipment leasing," even though Mr. McMichael admitted that CMC maintains no inventory of equipment for such purposes.

The Debtor contacted CMC and on October 2, 1998, the Debtor and CMC

entered into two sale and lease-back transactions through which the Debtor transferred title to substantially all of its assets to CMC for the sum of $100,000.00. The parties executed two Bills of Sale (Exhibits P–2 and P–8) for all of the Debtor's assets. The purported purchase included the Debtor's five vehicles, all of its basic shop equipment, including bandsaws, grinders, lathes, and hoists, and it also included all of the nominal assets of the Debtor, such as box fans and igloo coolers.

The parties simultaneously executed two "Equipment Lease Agreements" (Exhibits P–1 and P–7) under which all of the assets were immediately leased back to the Debtor.[1] It is uncontroverted that, notwithstanding the purported sale, possession of the assets were never transferred to CMC, but remained in the Debtor's control at all times. Further, ¶ 13 of each of the Equipment Lease Agreements contained the following provision:

13. TITLE. You understand that we will have sole title to the Equipment during the entire Lease Term, and you agree that this is a "true lease" and not one intended as security for purposes of Section 1–20(37)(sic) of the Uniform Commercial Code. YOU HEREBY GIVE POWER OF ATTORNEY TO SIGN AND FILE FINANCING STATEMENTS, AND YOU AGREE TO PAY OUR FILING FEES. If this Lease is ever determined to be other than a true lease, you hereby grant to us a security interest in the Equipment and agree that the financing statements will create a perfected security interest in our favor. You will not allow any liens or encumbrances to be placed on the Equipment.

The Debtor also conveyed to CMC a security interest in all of the Debtor's accounts receivable and other general intangibles.[2]

Under each of the two "Equipment Lease Agreements," the Debtor was required to tender to CMC sixty-three (63) monthly payments of $1,595.00, for a total of $100,485.00 under each agreement which was secured by a personal guaranty obtained from the Debtor's president.[3]

---

**1.** Even though there were actually two agreements executed between CMC and the Debtor, the Court in this opinion will often refer to the lease agreement in the singular form, since the two documents were identical except for the listing of particular assets.

**2.** "Addendum A" to each agreement provides as follows:

To secure the prompt payment, performance and observance in full of all of Lessee's obligations under and pursuant to the Lease Agreement and the schedules thereto.(sic) Lessee hereby pledges, transfers, sets over and assigns to Lessor, its successors and assigns, and grants to Lessor a first priority and continuing general security interest in, a lien upon and a right of setoff against (a) all of Lessee's accounts, accounts receivables (sic), contract rights, instruments, documents, notes, chattel paper, other forms of obligations, and general intangibles, arising from the use, from time to time, by Lessee or by third parties under an employment or service contract with Lessee, of any item of equipment which is the subject matter of the Lease Agreement or otherwise arising in connection with any item of equipment, whether secured or unsecured, whether now existing or hereafter created or arising, and whether or not specifically assigned to Lessor or not (hereinafter the "Receivables"); (b) all guaranties, mortgages on real or personal property, agreements or other property relating to any of the Receivable (sic) or acquired for the purpose of securing and enforcing any of such Receivables, (c) all books, records, ledger cards, computer tapes, disks and software relating thereto, and other property and general intangibles at any time evidencing or relating to Receivables ("Records") and (d) all proceeds of any of the foregoing in whatever form, including, without limitation, any claims against third parties related to the foregoing (hereafter all of the foregoing referred to collectively as "Collateral").

**3.** Actually, the Debtor was also required to pay an "advance rental" of $5,107.98 under each agreement which was refundable at no interest at the end of the lease if all obligations had been fulfilled, but which CMC could keep for "administrative costs" in the event that the actual lease agreement was never finalized.

CMC's representative, Mr. McMichael, testified that the rental payment amount was derived from the combination of a number of economic factors, other than just the amount of the designated "sale proceeds." The rental amount included an "interest expense" of 10.5%, although Mr. McMichael acknowledged on cross-examination that the stream of income flowing to CMC from this transaction likely produced an actual yield to CMC of over 23%. The rental amount also included a 6% brokerage fee, which was equivalent to the cost of a performance bond obtained to protect CMC from its investment in sub-prime commercial paper. It also included an administrative service fee, which CMC admitted was compensation solely based upon its limited monthly efforts to monitor and collect the payments since CMC had no maintenance obligations under the agreement.

The lease agreements further provided that, notwithstanding CMC's ownership, the risk of loss was solely upon the Debtor. The Debtor was responsible for the payment of all taxes, as well as repair and service expenses on the assets, and the Debtor was required to maintain insurance on all assets, with CMC to be carried as the loss payee on such insurance policies. Mr. McMichael again confirmed on cross-examination that, at the time of the transaction, the fair market value of the transferred assets was worth "much more" than the purchase price paid by CMC and that the value of the assets was not a determinative factor in determining the amount of money transferred to the Debtor. The two agreements also contained an addendum under which the Debtor received an

option to repurchase all of the assets encompassed by each such agreement at the end of the lease term for the sum of $5,000.00 or the fair market value of the assets, whichever would be higher at that time.

The Debtor made its monthly payments to CMC on a timely basis for approximately one year and was current on that obligation at the time it filed a petition for relief under Chapter 7 of the Bankruptcy Code. Daniel J. Goldberg (the "Trustee") was subsequently appointed as the Chapter 7 Trustee in this case. Shortly thereafter, the Trustee requested CMC to produce any documents which evidenced the perfection of CMC's interest in the Debtor's assets. Before responding to the Trustee's request, CMC filed UCC–1 financing statements with the Texas Secretary of State regarding both lease agreements, nearly two months after the Debtor filed for bankruptcy protection.[4]

CMC filed the present motion for stay relief so that it might repossess the property. In the motion, CMC asserted that cause existed for lifting the automatic stay because its interest in the Debtor's assets was not being adequately protected. The Trustee objected to the motion and stated that CMC possessed no interest entitled to adequate protection since the transaction between the Debtor and CMC was not a true lease arrangement, but was rather a disguised secured transaction and that, as of the time of the bankruptcy filing, except as to five specific vehicles[5], CMC merely held an unperfected security interest which was subordinated to the Trustee's interest in the specified assets pursuant to 11 U.S.C. § 544.[6] Therefore, the Trustee

**4.** CMC's representative testified that it normally files UCC–1 financing statements on every lease transaction, but that it failed to do so in this case due to an "administrative error."

**5.** Prior to the final hearing, the parties had agreed that, even in the event the lease transactions were found by the Court to be disguised secured transactions, CMC had perfected its security interest in five vehicles of

the Debtor and the Trustee consented to the termination of the automatic stay on those five vehicles. An interim order terminating the stay was previously entered with regard to four of the vehicles and the Court orally terminated the stay as to the fifth vehicle at the hearing.

**6.** Under the "strong-arm" provisions of 11 U.S.C. § 544, a trustee, on the date a debtor files a bankruptcy petition, obtains the status

asserted that there is no cause for lifting the automatic stay.

## III. *DISCUSSION*

■ CMC seeks relief from the automatic stay for cause under the provisions of 11 U.S.C. § 362(d)(1) due to an asserted lack of adequate protection of its purported ownership interest in the assets listed in the two "Equipment Lease Agreements."[7] CMC has established a *prima facie* case for relief by introducing the lease agreements under which it claimed an ownership interest and through the Trustee's acknowledgment that, as to all assets other than the five vehicles, no action had been taken by the estate to provide any protection to CMC's interests in those assets. Accordingly, the burden is upon the Trustee to demonstrate by a preponderance of the evidence that CMC possesses only an unperfected security interest for which adequate protection is not required. *See generally, In re Rogers*, 239

B.R. 883, 886 (Bankr.E.D.Tex.1999) and the cases cited therein.[8]

■ Thus, the issue of whether CMC should be granted stay relief turns upon whether the transaction between CMC and the Debtor was a true lease or whether it was a disguised secured transaction which would be subject to the perfection requirements of Article 9 of the Uniform Commercial Code. "Whether a consignment or a lease constitutes a security interest under the Bankruptcy Code will depend upon whether it constitutes a security interest under applicable State or local law." *In re Lamar*, 249 B.R. 822, 825 (Bankr.S.D.Ga. 2000) (*quoting* H. Rep. No. 95–595, 95th Cong., 1st Sess.1977, p. 313–14, reprinted in 1978 U.S.C.C.A.N. 5963, 6271). The Court will therefore apply Texas law to determine the true nature of the agreement.[9]

To distinguish between a lease and a disguised secured transaction under Texas

---

of a hypothetical lien creditor. § 544(a) states, in relevant part, that:

> [t]he trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—
> (1) a creditor that extends credit to the debtor at the time of the filing of the commencement of the case, and that obtains, at such time or with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists; ...

7. § 362(d) of the Bankruptcy Code provides that:

> [O]n request of a party in interest, and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay
> (1) for cause, including lack of adequate protection of an interest in property of such party in interest;

8. This burden is consistent with similar cases which place the burden of proof upon the

party who asserts that a transaction is other than what it purports to be in a written agreement. *See, e.g., In re Edison Bros. Stores, Inc.*, 207 B.R. 801, 812, (Bankr.D.Del.1997) [placing the burden of proof upon a debtor "as the party seeking to characterize the Lease Agreement as an instrument other than a lease, ..."] and *In re Murray*, 191 B.R. 309, 316 (Bankr.E.D.Pa.1996) [identifying a debtor who sought to characterize a lease agreement as a disguised secured transaction as the party "whose burden it is to prove that the Lease is other than what it purports to be."].

9. Though ¶ 18 of the lease agreement provides that the lease shall be governed by the laws of the "Applicable Jurisdiction," defined as "the state, as the same may change from time to time, where the holder of the Lessor's interest in this Lease maintains its principal office responsible for administering this Lease," no party argued that anything other than Texas law applied to the transaction. The only alternative would be California which adopted the Uniform Commercial Code revisions to section 1201(37) in 1988, *Addison v. Burnett*, 41 Cal.App.4th 1288, 1294, 49 Cal. Rptr.2d 132, 136 (1996), and which adopted Article 2A in 1990. *See generally*, 2 James J. White and Robert S. Summers, Uniform Commercial Code § 13–1 (4th ed. 1995 & Supp. 1998). Thus, the analysis would be the same under either alternative.

law, one must begin with an examination of the UCC definition of "security interest." From the adoption of the UCC in Texas in 1966 until its amendment in 1989, former section 1.201(37) of the Texas UCC read as follows:

> Whether a lease is intended as security is to be determined by the facts of each case; however:
>
> (1) the inclusion of an option to purchase does not of itself make the lease one intended for security; and
>
> (2) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

TEX.BUS. & COMM.CODE ANN. § 1.201(37) (Vernon 1967) (amended 1989).

Although subsection (2) of this particular definition offered two limited scenarios under which a lease would be characterized as a secured transaction as a matter of law, the statute usually led juries and courts into a murky assignment——to ascertain the true intent of the parties as an issue of fact through an examination of the relevant facts and circumstances of the case. *See, Superior Packing, Inc. v. Worldwide Leasing & Financing Inc.,* 880 S.W.2d 67, 71–72 (Tex.App.—Houston [14th Dist.] 1994, writ denied), *Davis Brothers v. Misco Leasing, Inc.,* 508 S.W.2d 908, 911–12 (Tex.App.—Amarillo 1974, no writ). *See also, Woods–Tucker Leasing Corporation of Georgia v. Hutcheson–Ingram Development Company,* 626 F.2d 401, 414 (5th Cir.1980), *vacated on other grounds,* 642 F.2d 744 (5th Cir.1981), in which the Fifth Circuit affirmed a bankruptcy court's decision that a transaction was not a lease by applying five factors to determine that the transaction was in fact a disguised security agreement: (1) the fact that the value of the equipment exceeded the purchase price paid by the lessor, (2) the amount of rent the lessee paid over the term of the lease was based on factors other than the value of the property, (3) the lessee involved had approached the lessor with the intent to borrow money, not to sell its equipment, (4) the lessor maintained no inventory of goods to lease, and (5) the lessee was required to pay all taxes, insurance, and repair expenses associated with the equipment. 626 F.2d at 414. It was under this subjective standard that both parties submitted this case to the Court.

The Trustee argues that, under the *Woods–Tucker* analysis, the relevant facts and circumstances of this case prove that the transaction between the Debtor and CMC was intended for security. The Trustee references the fact that CMC's representative testified that the value of the property substantially exceeded the purchase price paid by CMC, that CMC was in the equipment financing business and, therefore, maintained no inventory of equipment for prospective lessees, and that several factors other than the cost of the equipment, including CMC's cost of funds, went into CMC's determination of how much "rent" to charge the Debtor. He further noted that the "Equipment Lease Agreement" provided that the lessee would be responsible for all taxes, insurance, and maintenance costs. The Trustee contends that, under *Woods–Tucker,* such conditions combine to demonstrate that the Debtor/Lessee has always been the true owner of the property as opposed to a party with merely a possessory interest in the assets. With regard to the parties' intent, the Trustee also relies heavily upon the testimony of the Debtor's former president who, although called as a witness for CMC, testified without contradiction that she approached CMC to borrow money using the Debtor's assets as collateral for the loan, not as a means to sell the Debtor's equipment.

Conversely, and notwithstanding the testimony of the Debtor's former president, CMC asserts that the only relevant consideration for the Court is the language

of ¶ 13 in the lease agreement which provides as follows:

> You [the Debtor] understand that we will have sole title to the Equipment during the entire Lease Term, and you agree that this is a "true lease" and not one intended for security for purposes of Section 1–20(37) [sic] of the Uniform Commercial Code. YOU HEREBY GIVE U.S. POWER OF ATTORNEY TO SIGN AND FILE FINANCING STATEMENTS, AND YOU AGREE TO PAY OUR FILING FEES. If this Lease is ever determined to be other than a true lease, you hereby grant us a security interest in the Equipment and agree that the financing statements will create a perfected security interest in our favor. You will not allow any liens or encumbrances to be placed on the Equipment.

The Court also notes that ¶ 6(D) of the agreement claims to memorialize an acknowledgment by the Lessee–Debtor that "... this lease qualifies as a 'finance lease' as that term is defined in Article 2A of the Uniform Commercial Code." CMC claims that the inclusion of these terms prohibits this Court from consideration of any other facts which might support the Trustee's argument that the transaction was in fact intended for security and it cites *Bilmar Drilling, Inc., v. IFG Leasing Co.,* 795 F.2d 1194 (5th Cir.1986) as authority for that position.

■ However, the *Bilmar Drilling* case does not support the proposition that a boilerplate term in a form lease limits a court's ability to consider other factors in determining whether a transaction is a true lease or a disguised security interest. In *Bilmar Drilling,* the Fifth Circuit held that the parol evidence rule prevented a lessee from introducing evidence of a written agreement, executed prior to the lease in question, which provided the lessee with a purchase option on the leased equipment; an agreement which was in direct conflict with the actual terms of the lease which contained no such option and which,

in fact, provided that the lessee was to return the property to the lessor at the end of the lease term. However, there is no parol evidence issue in this case. There was no attempt to introduce evidence of prior agreements between the Debtor and CMC which contradicted the lease agreements. Instead, the Trustee argues that a review of the circumstances surrounding the transaction between the Debtor and CMC demonstrates that the parties subjectively intended for the sale and lease-back of assets to act as security for the repayment of funds by the Debtor. The *Bilmar Drilling* decision does not preclude such an inquiry and is simply inapplicable to the case at bar.

■ Further, the jurisprudence is clear that, in determining whether a document is a true lease or a disguised security agreement, this court is not bound by any "acknowledgment" by the Debtor nor by any other language or designation of parties contained in the agreement. *In re Homeplace Stores, Inc.,* 228 B.R. 88, 93 (Bankr.D.Del.1998) [noting that "... [w]hether a document is a security agreement as opposed to a lease ... is dependent on certain factors extrinsic to the document and not capable of control by words in the document,"] *quoting* 2 JAMES J. WHITE AND ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE 565 (4th ed. 1995 & Supp.1998) [hereinafter WHITE AND SUMMERS]; *see also, In re Owen,* 221 B.R. 56, 62 (Bankr.N.D.N.Y.1998) [finding that "... the labeling of the Agreement as a 'lease' and referring to the parties as 'lessor' and 'lessee' in and of themselves are not controlling."].

While dealing with these arguments might present the Court with an interesting historical diversion, the parties unfortunately failed to consider or even to recognize that the process of distinguishing between leases and sales involving disguised security interests has been significantly modified over the past decade or so. In acknowledging the substantial growth of the use of the lease as a commercial

device in recent years and the need to provide greater protection to the rights of third parties in the light of that growth, particularly as it applied to the need to determine whether perfection requirements of Article 9 had to be met with regard to such agreements, it was recognized that the more subjective examination of the parties' intentions under former section 1–201(37) of the UCC should give way to a more objective examination of the economic realities of the transaction.[10]

Thus, in order to address the growing area of commercial leases, a new article was added to the UCC for the first time since its introduction in the early 1950's [11] and the definition of "security interest" under § 1–201(37) was amended to conform with the new Article 2A provisions.[12] Under this new amalgamation,

> ... the focus of the analysis is to determine whether the parties to the lease anticipated that any significant value would remain in the leased property for return to the lessor at the end of the lease term, and whether such value is returnable through the lessee's own free will. This will depend upon an objective examination of the substance of the transaction, with the aid of tests set forth in the Uniform Commercial Code definitions of "lease," "finance lease," and "security interest." The revised

statute sets forth a two-part test which, if satisfied, has been held to mandate a finding of a secured transaction or, arguably, sets forth a rebuttable presumption of such a finding. This test has its origins in the case law developed under the prior version of the statute, the first part seeking to determine if the lease is terminable by the lessee (namely, whether it contains a so-called "hell or high water clause") ... and the second part seeking to establish what residual value, if any, was anticipated by the parties to remain at the end of the lease term.

E. Carolyn Hochstadter Dicker and John P. Campo, *FF & E and the True Lease Question: Article 2A and Accompanying Amendments to UCC Section 1–201(37)*, 7 AM. BANKR.INST. L.REV. 517, 518 (1999) [hereinafter Dicker and Campo]. These statutes now prescribe the correct process to be utilized by this Court for distinguishing between a true lease and an agreement creating a security interest, notwithstanding the failure of the parties to even acknowledge any change in the applicable law.

Though the lease agreement in this case purports to be a "finance lease," a document cannot constitute a "finance lease" under Article 2A unless it first qualifies as a "lease." [13] Article 2A states, in relevant

---

**10.** One recent article noted that

[a]lthough Old UCC 1–201(37) provided objective tests for determining whether the parties to a lease "intended" a security interest, it was confusing in its use of the word "intent" which seemed to also indicate a subjective approach. New UCC 1–201(37) was designed to correct such confusion by eliminating reference to intent. The current test is whether the lease itself "creates" a security interest.

E. Carolyn Hochstadter Dicker and John P. Campo, *FF & E and the True Lease Question: Article 2A and Accompanying Amendments to UCC Section 1–201(37)*, 7 AM. BANKR.INST. L.REV. 517, 532–33 (1999).

**11.** Richard L. Barnes, *Distinguishing Sales and Leases: A Primer on the Scope and Purpose of UCC Article 2A*, 25 U. MEM. L.REV. 873, 879 (1995). As of October 1, 1999, Article 2A had been adopted in forty-seven (47) states

and the District of Columbia, including the states of New York (1994) and California (1990). The three states that had not adopted Article 2A were Connecticut, Louisiana and South Carolina. William B. Piels, *Equipment Leasing*, 1167 PLI/Corp 831, 874 (March, 2000).

**12.** The comment to the amended version of § 1–201(37) notes that the definition under the former version was "vague and outmoded" and that "[t]he focus of the changes was to draw a sharper line between leases and security interests disguised as leases to create greater certainty in commercial transactions." TEX. BUS. & COMM.CODE ANN. § 1.201(37) cmt. 37 at p. 13 (Vernon Supp. 2000).

**13.** TEX.BUS. & COMM.CODE ANN. § 2A.103(10) cmt. (g) (Vernon 1994).

part, that a "[l]ease means a transfer of the right to possession and use of goods for a term in return for consideration, *but a sale ... or retention or creation of a security interest is not a lease.*" [14] Thus, any consideration of Article 2A is premature until such time as an analysis of the agreement is conducted under the provisions of § 1.201(37) in order to determine whether a security interest was created by the agreement.[15]

The revised § 1.201(37), as adopted in Texas in 1989, now defines the term "security interest" as follows:

(37)(A) "Security Interest" means an interest in personal property or fixtures which secures payment or performance of an obligation.

\*     \*     \*

(B) Whether a transaction creates a lease or security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and:

(i) the original term of the lease is equal to or greater than the remaining economic life of the goods;

(ii) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;

(iii) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement; or

(iv) the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

Tex. Bus. & Comm.Code Ann. § 1.201(37) (Vernon Supp.2000).

■ In attempting to maintain the validity of the developed methodologies to distinguish a secured transaction from a lease, while recognizing the fact that a finance lease might encompass certain attributes which such methodologies might have previously identified as evidence of a secured transaction,[16] § 1–201(37) was revised by deleting any reference to the

---

**14.** Tex.Bus. & Comm.Code § 2A.103(10) (Vernon Supp.2000) (emphasis added).

**15.** Dicker and Campo, *supra* note 10, at 523 ["Accordingly, this provision [§ 2A.103(10) ] requires that an analysis of the lease be made under UCC section 1–201(37) as a prerequisite to qualify as a finance lease."].

**16.** Dicker & Campo note that the analysis under 1–201(37) "... requires one to take into account the fact that certain attributes of a finance lease which, under the old law may have been considered to be attributes of a secured transaction, are no longer necessarily considered as such under the current interplay between Article 2A and New UCC 1–201(37)." Dicker and Campo, *supra* note 10, at 523. Subsection (C) of the Texas adoption of § 1.201(37) accomplishes this by recognizing that:
 [a] transaction does not create a security interest *merely* because it provides that:
 (i) the present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into;
 (ii) the lessee assumes risk of loss of the goods, or agrees to pay taxes, insurance, filing, recording or registration fees, or service or maintenance costs with respect to the goods;
 (iii) the lessee has an option to renew the lease or to become the owner of the goods;
 (iv) the lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed; or
 (v) the lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed. Tex.Bus. & Comm.Code Ann. § 1.201(37)(C) (Vernon Supp.2000) (emphasis added).

intent of the parties and by focusing the inquiry instead upon the economic realities of the transaction.[17] While the statute provides a general rule that the true nature of a transaction will be determined by the facts of each case, subsection (B) of § 1.201(37)

> ... delineates an exception to the general rule for leases that are not terminable by the lessee prior to the end of the designated lease term, and which satisfy one of the four factors enumerated in that section. For leases which satisfy the foregoing bright line test, the case-by-case analysis exception applies and the inquiry comes to an end—such leases constitute security agreements as a matter of law.

*In re Kim,* 232 B.R. 324, 330 (Bankr. E.D.Pa.1999).[18] Thus, a court must engage in this twostep analysis in order to determine whether a finding of a security interest is compelled under § 1.201(37)(B). If a court determines that the consideration of this exception does not compel a conclusion that a security interest was created *per se,* it should proceed to a examination of all of the facts to determine whether the economic realities of a particular transaction create a security interest.[19]

■ In determining whether § 1.201(37)(B) compels a finding of a security interest in this case, the Court first notes that, under the agreement between the Debtor and CMC, the Debtor was absolutely precluded from terminating the agreement prior to the conclusion of all payments.[20] ¶ 2 of the agreement provided

**17.** "This test [under the new 1–201(37) ] has its origins in the case law developed under the prior version of the statute." Dicker and Campo, *supra* note 10, at 518. Thus many courts have viewed the new 1–201(37) as a clarification of the old rule, not as a substitute for it. *See, e.g., Woodson v. Ford Motor Credit Company (In re Cole),* 114 B.R. 278, 281 (N.D.Okla.1990) [finding that the amendment "... merely revised § 1–201(37) to further aid courts in drawing lines between leases and agreements creating security interests. The amendment did not change the substantive law."] and *In re Bumgardner,* 183 B.R. 224, 229 (Bankr.D.Idaho 1995) [asserting that the amendment "was intended to clarify, not change the law"].

**18.** Most courts interpreting the statute have also found that the finding of a security interest is mandated if this two-part test is satisfied. *See, e.g., In re Owen,* 221 B.R. at 60 [finding that "[w]hile NYUCC § 1–201(37) clearly indicates that the Court is to examine the facts of each case in characterizing a transaction, ... the first paragraph of the amended statute qualifies this by setting out a bright line test whereby, as a matter of law, a transaction creates a security interest"]; *In re Wakefield,* 217 B.R. 967, 970 (Bankr.M.D.Ga. 1998) [stating that "[i] f the lessee is bound for the entire term of the agreement and if any one of the requirements of subparagraphs (a), (b), (c), or (d) are met, then the court's inquiry ends and the transaction is deemed to have created a security interest"]; *In re Taylor,* 209 B.R. 482, 484 (Bankr.S.D.Ill.1997) [holding that "the lease will be construed as a

security interest as a matter of law if the debtor cannot terminate the lease and one of the enumerated requirements is satisfied"] (emphasis in original); *In re Southern Star Foods, Inc.,* 202 B.R. 784, 788 (Bankr. E.D.Okla.1996) [determining that a lease was secured transaction "as a matter of law" because it met two-part test].

**19.** *In re Taylor,* 209 B.R. 482, 484–85 (Bankr. S.D.Ill.1997). *See also, In re Murray,* 191 B.R. 309, 315 (Bankr.E.D.Pa.1996) [finding that "[A]bsent a mandated classification [e.g., that the agreement is a security interest], the determination is based on the facts of the case. At this point, the third unnumbered paragraph comes into effect."]

**20.** This is a common provision in finance leases known as a "hell or high water" clause. As has been noted,

> [t]he essence of this structure [a finance lease] is a provision requiring that the lessee, once it accepts the leased item, to pay its rent in all events (i.e., come hell or high water) without regard for the proper function of the item or the conduct of the lessor with respect to the subject or any other transaction.... The financing practices of the third-party leasing industry make even more compelling the need for an irrevocable lessee commitment.

Martin B. Robins, *Come Hell or High Water or Article 2A: How Legislatures and Practitioners Can Cope with Several Drafting Anomalies in Article 2A of The Uniform Commercial Code,* 101 COMM. L.J. 357, 362–64 (Winter 1996).

that, once the agreement was accepted by CMC, "... you [the Debtor] agree that it will continue for the full term [of the lease] and any extension term." ¶ 3 precluded any type of prepayment by the Debtor and, most significantly, ¶ 7(A) of the agreement set forth in capital letters under the heading of "Important Conditions" that:

> [Y]OU [the debtor] UNDERSTAND AND AGREE THAT: (A) THE LEASE CANNOT BE CANCELED BY YOU AT ANY TIME FOR ANY REASON....

The inclusion of this "hell or high water" clause thus meets the first requirement under § 1.201(37)(B).

As for the four so-called "bright line" factors, only the fourth factor can be properly applied under the evidence of this case.[21] The Debtor–Lessee in this transaction was given an option to purchase the leased property at the expiration of the lease term. It provided as follows:

> [P]rovided the Lease has not terminated early, Lessee [the Debtor] shall have the following option at the end of the original term:
>
> BUY: Purchase the Equipment for 10% ($5,000.00) of the Lessor's cost of the equipment or the Fair Market Value, whichever is greater. This amount payable (sic) in a single sum immediately upon expiration of the lease.
>
> OR
>
> RENEW: Renew the lease contract.

This option to purchase raises the question of whether the additional consideration required to be paid by the Debtor to "gain" ownership could be properly characterized as "nominal" for the purposes of § 1.201(37)(B)(iv).[22]

There is little doubt that, if the Debtor's option to purchase under the two agreements is quantified at a collective $10,000.00 (10% of the Lessor's "cost" of the equipment—i.e. the amount of money tendered to the Debtor by CMC), the purchase option amount is nominal.

The 10% standard is nominal additional consideration compared to the original "purchase price" of $100,000.00. *In re Bevis Co., Inc.*, 201 B.R. 923, 926 (Bankr. S.D.Ohio 1996) [finding option price of 10% of cost of equipment to be nominal]; *In re Phoenix Pipe & Tube*, 154 B.R. 197, 200 (Bankr.E.D.Pa.1993) [same]; *see also In re Super Feeders, Inc.*, 236 B.R. 267, 270 (Bankr.D.Neb.1999) [finding a fixed option price of 5% of the original purchase price to be nominal while recognizing that a purchase option price of less than 25% of the original purchase price constitutes evidence of a security interest, *citing Kimco Leasing, Inc. v. State Board of Tax Commissioners*, 656 N.E.2d 1208, 1215 (Ind. Tax1995) ] and Dicker and Campo, 7 Am. Bankr.Inst. L.Rev. at 543, notes 90 and cases cited therein ["... option prices of less than 25% of the original cost have been found to be nominal."]

■ Secondly, "[w]hen the option price is a relatively low percentage of the total lease payments, this indicates nominal consideration." *In re Super Feeders, Inc.*, 236 B.R. at 270. In this case, the $10,000.00 option price is certainly nominal (5%) compared to the $200,970.00 in aggregate rental payments made by the Debtor under the two agreements. *See also, Orix Credit Alliance, Inc. v. Pappas*, 946 F.2d 1258, 1261 (7th Cir.1991) [finding an option price of 12% of total rental payments to be significant in determining an agreement

---

**21.** The Trustee presented no evidence regarding the remaining economic life of the leased goods nor was the Debtor, by the literal language of the agreement, contractually bound to renew or purchase the assets in question.

**22.** Under § 1.201(37)(D), additional consideration is considered nominal if it is "... less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised." The statute further provides that what is "reasonably predictable" (as well as the "remaining economic life of the goods") are to be determined with reference to the facts and circumstances at the time the transaction is entered into. § 1.201(37)(E).

was a sale rather than a lease]; and *In re Wakefield,* 217 B.R. 967, 971 (Bankr. M.D.Ga.1998) [finding 10% option price "to be significant in concluding that the option price is nominal."].

However, the option to purchase in this case is phrased in the alternative. The purchase option is actually the greater of 10% of the "cost" of the equipment or the fair market value of all of the assets. At first glance, the inclusion of a potential reference to fair market value in the determination of the purchase option amount would seemingly preclude any examination of the nominality of the purchase option under § 1.201(37)(D)(ii) or any other serious consideration that CMC did not retain a significant residual interest in the "leased" property.[23] However, such a mechanical application of that subsection without recognition of the existing economic realities of the transaction belies the very standard that § 1.201(37) seeks to impose. *In re Howell,* 161 B.R. 285, 290, n. 4 (Bankr.N.D.Fla.1993) ["A finding that the consideration paid for exercising a purchase option approximates the subject property's fair market value does not preclude a finding that the consideration is still nominal when reviewing all the facts and circumstances involved in the transaction."]. Even with such a purchase option standard, "the 'lease' will still be deemed one intended as security if the facts otherwise expose economic realities tending to confirm that a secured transfer of ownership is afoot." *Steele v. Gebetsberger (Matter of Fashion Optical, Ltd.),* 653 F.2d 1385, 1389 (10th Cir.1981). Thus, whether viewed in the context of the bright-line factor articulated in § 1.201(37)(B)(iv) or under an application of the general rule to examine all of the surrounding economic circumstances of the transaction, this Court must determine whether CMC retained a meaningful re-

versionary interest under this agreement. This Court concludes that it did not.

In this transaction the payment to occur at the end of the lease term was not necessarily driven by the residual value of the "leased" assets. In fact, the parties at the time of the transaction made no attempt to ascertain what that residual value would be at the end of the lease term because they understood that the circumstances of the transaction dictated that the Debtor would exercise the purchase option no matter how the final figure was quantified.

■ Courts have recognized that an apparent option to purchase, even when potentially based upon fair market value, can, in fact, be illusory under the circumstances of a particular case. Articulated as a "sensible person" test, it provides that "where the terms of the lease and option to purchase are such the only sensible course for the lessee at the end of the lease term is to exercise the option and become the owner of the goods, the lease was intended to create a security interest." *Matter of Fashion Optical, Ltd.,* 653 F.2d at 1389; *see also In re Howell,* 161 at 289, n. 3. Articulated in a less genteel manner, "if only a fool would fail to exercise the purchase option, the option is generally considered nominal and the transaction characterized as a disguised security agreement." *Taylor,* 209 B.R. at 486 (citations omitted). "No matter how the option amount is expressed, if the only sensible course of action is to exercise the option, then it is one intended for security." Richard L. Barnes, *Distinguishing Sales and Leases: A Primer on the Scope and Purpose of UCC Article 2A,* 25 U. Mem. L.Rev. 873, 885 (1995) and cases cited therein [summarizing that "the option price is nominal if the sensible lessee would in effect have no choice and, in

---

**23.** § 1.201(37)(D)(ii) provides that:
Additional consideration is not nominal if:
(ii) when the option to become the owner of the goods is granted to the lessee, the

price is stated to be the fair market value of the goods determined at the time the option is to be performed.

making the only sensible choice, would cut off the lessor's reversionary interest."].

It cannot be ignored nor forgotten that the list of assets affected by this transaction was comprehensive in scope. As confirmed by a comparison of the leased equipment with the Debtor's schedules as introduced by the Trustee (Exhibits P–1, P–7, and D–A), the Debtor "sold" to CMC virtually every asset it owned and then "leased" all of those goods back, even though they, of course, never left their original location.[24] The transaction encompassed not only valuable equipment necessary to the Debtor's business, such as welders, forklifts and bandsaws, but it also included all of the Debtor's office equipment, including chairs, tables and outdated computer equipment, all of its yard contents including a scrap bucket, as well as additional minutiae such as calculators, a fire hose, a stepladder, a Mr. Coffee coffee maker, and the company's time clock. All of these "leased" assets had, in fact, been used in the Debtor's business for an undetermined period of time and the continued use of such assets was never interrupted by this transaction. Because all of its assets were at risk as a result of this transaction, it is not surprising to learn that the Debtor was current on its payments under the agreements at the time it filed its Chapter 7 case.

Assuming that it had continued to fully perform its obligations under the lease, the Debtor–Lessee would be facing the following alternatives at the end of the lease term: (1) to purchase all of its business assets for $10,000.00 or, only in the event it was found to be higher, for an amount equal to the fair market value of the goods; (2) to continue renting all of its business assets at a combined price of $3,190.00 per month, (3) to terminate the lease, assume the corresponding costs to remove and return all of its assets to CMC, and to thereafter engage in a comprehensive program to locate and purchase (or lease?) replacements for its entire asset portfolio; or (4) to terminate the lease and to cease its business activities, since virtually all of the Debtor's assets were subject to the CMC agreement. Facing those alternatives, particularly the cessation of its business enterprise, the Debtor–Lessee would have had only one reasonable economic choice. The purchase option price, whether defined as $10,000 or in terms of fair market value, was rendered nominal because the Debtor, acting as a sensible lessee, would have no choice other than to exercise the purchase option in order to stay in business. Barnes, 25 U. Mem. L.Rev. at 885 ["The option price is nominal if the sensible lessee would in effect have no choice and, in making the only sensible choice, would cut off the lessor's reversionary interest."]. It may explain why CMC never worried about the residual value of the goods, because, absent a default on the "lease" payments, CMC would never assume possession of them. However, ignoring the dispute regarding the intentions of the parties, the economic realities of the transaction only gave the Debtor one credible financial alternative and that limitation rendered meaningless any possibility of a reversion of the goods to CMC. The retention of title to all of the Debtor's assets by CMC served solely as a means of securing

24. Notwithstanding the attempted self-characterizations contained in the document, this was not a typical finance lease. There was no third party supplying the equipment in this transaction. Nor was the transaction limited to specified or particular equipment or inventory. See, Dicker and Campo, *supra* note 10, at 524, who observe generally that:

[A] finance lease is a product of a transaction among three parties: (i) the supplier of the equipment; (ii) the lessee, who selects the supplier and the equipment; and (iii) the lessor, who supplies the money necessary to purchase the equipment. The purpose of the finance lease structure is to allow the lessor to play the limited role of being a financier/owner without the attendant responsibilities of ownership. Rather, the lessee ordinarily must look to the third party supplier or manufacturer for typical owner representations and warranties, and the lessee usually bears risks such as that of the loss of the equipment.

payments due under the contract. Under these circumstances, this was not a typical finance lease. It was typical financing, disguised as a lease.

## IV. CONCLUSION

 This Court accordingly finds that the two agreements between the Debtor and CMC must be properly characterized under the provisions of § 1.201(37)(B) of the Texas Business and Commerce Code as documents creating security interests in the Debtor's assets in favor of CMC. This conclusion is mandated under the *per se* rule of § 1.201(37)(B)(iv), as well as under a general examination of all of the facts and circumstances in this case. Under either analysis, the security interests held by CMC under the agreements were required to be perfected on the date of the commencement of the Debtor's case in order to defeat the "hypothetical lien creditor" status given to the Chapter 7 trustee pursuant to § 544 of the Bankruptcy Code. It is undisputed that, except as to the five vehicles specified by the parties, CMC's attempt to perfect its interests in the Debtor's assets had not occurred by that filing date.

Accordingly, the Court concludes that, except as to the five vehicles upon which the automatic stay was previously terminated by the Court, the motion for relief from automatic stay filed by Commercial Money Center, Inc., should be denied. CMC's unperfected security interests in the remaining assets, which are subordinated to the Trustee's interest in those assets pursuant to 11 U.S.C. § 544, are not entitled to adequate protection, nor have any other grounds been demonstrated to establish that cause exists to grant CMC relief from the automatic stay.

This memorandum of decision constitutes the Court's findings of fact and conclusions of law [25] pursuant to Fed.R.Civ.P.

52, as incorporated into contested matters in bankruptcy cases by Fed.R.Bankr.P. 7052 and 9014. A separate order will be entered which is consistent with this opinion.

25. To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. The Court reserves the right to make additional findings and conclusions as necessary or as may be requested by any party.